UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                      :

YOUNGJOO RHEE,               :

                 :

          Plaintiff,    :

                 :          21-cv-4283 (LJL)

     -v-               :

                 :      OPINION AND ORDER

SHVMS, LLC, d/b/a SANTÉ VENTURES,  :

                 :

         Defendant.   :

                 :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/8/2023__

LEWIS J. LIMAN, United States District Judge:

       Defendant SHVMS, LLC, d/b/a/ Santé Ventures ("Defendant" or "Santé") moves for

summary judgment dismissing Plaintiff Youngjoo Rhee's ("Plaintiff" or "Rhee") causes of

action brought under her Third Amended Complaint ("TAC"), Dkt. No. 42.  Dkt. No. 75.  In her

TAC, Plaintiff brings claims of breach of contract, unjust enrichment, and breach of fiduciary

duty.  Dkt. No. 42.  For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

       The following facts are drawn from the Parties' Rule 56.1 Statements and the materials

submitted in connection with the motion.  Dkt. Nos. 77, 79.[1]  Such facts are undisputed unless

otherwise indicated, and the Court draws all reasonable inferences in favor of Plaintiff, the non-

moving party.

---

[1] Plaintiff failed to properly submit a Rule 56.1 Counterstatement.  Instead, Plaintiff filed
responses to the individual paragraphs in Defendant's Rule 56.1 Statement in her memorandum
of law in opposition to the motion.  Plaintiff does not include any additional paragraphs of
material facts.  For the purposes of this motion, this Court construes those responses as
Plaintiff's Rule 56.1 Counterstatement.

Defendant is a private hedge fund focused on managing and developing venture capital funds in the "Biotech, Medtech, and Healthtech fields."  Dkt. No. 77 ¶ 1; Dkt. No. 78-1 ¶ 2.  Its business involves raising and then allocating capital to funds.  Dkt. No. 78-1 ¶ 2.  Once those funds reach adequate capital, they are invested in companies within certain targeted industries.  *Id*.  The fund is then closed after a period of time, and Defendant begins the cycle again.  *Id*.

Plaintiff began working for Defendant in 2010 as the Director of Marketing and Investor Relations.  Dkt. No. 77 ¶ 2; Dkt. No. 78-1 ¶ 3.  The original terms of her employment were set forth in an offer letter, delivered to her via email, on August 18, 2010 ("Employment Agreement").  Dkt. No. 77 ¶ 3; Dkt. No. 78-2.  The Employment Agreement provides for Plaintiff to be paid "Annual Base Compensation."  Dkt. No. 78-2 at ECF p. 1.  Among its terms, the Employment Agreement also provides for "Incentive Compensation."  *Id*.  One of those incentives is described as a "Cash Bonus" based on the amount of capital raised for Defendant's funds.  That provision states that Plaintiff would be compensated in the following way:

> Cash Bonus:  1.00% of the total amount of capital directly raised, paid in equal quarterly installments over three years.  100% vested upon closing each LP; adjusted appropriately in the case of a defaulting LP.  For example, if you are directly involved in sourcing, qualifying and helping us close $60[ million] in capital in Fund II, then your incentive compensation would be an additional $600,000 paid quarterly over three years, or $50,000 per quarter.

*Id.*  The Employment Agreement also awards "Carried Interest" in Defendant's second fund ("Fund II") based on the amount of capital Plaintiff raises:

> Carried Interest:  0.50% of the carried interest in Fund II per $20[ million] of capital directly raised, up to a maximum of 2.00%.  For example, if you are directly involved in sourcing, qualifying and helping us close $60[ million] in capital in $200[ million] Fund II that achieves its target of a 3.0x gross return, this would result in pre-tax proceeds to you of approximately $1,750,000.  Your carried interest would be 50% vested upon closing each $20[ million] grant threshold, with the balance vesting monthly over six years.

*Id*.  The Employment Agreement does not award carried interest for any subsequent funds raised by Defendant.  The parties dispute when Defendant concluded that the Cash Bonus payment structure was improper transaction-based compensation under the regulations promulgated by the United States Securities and Exchange Commission ("SEC") because Plaintiff lacked a broker license.  *See* Dkt. No. 79 ¶ 5; Dkt. No. 78-5 at 28–30.[2]  The Employment Agreement does not describe the functions Plaintiff was to perform as Director of Marketing and Investor Relations.  Unlike its briefing on the motion to dismiss, Defendant does not claim in its Rule 56.1 Statement or its briefing that the Employment Agreement was subsequently modified by the parties.

In her role as Director of Marketing and Investor Relations, Plaintiff contacted potential investors for Defendant's Fund II between 2010 and 2011.  Dkt. No. 77 ¶ 6; Dkt. No. 78-4 at 23–25.  During her employment with Defendant, Plaintiff was not a licensed broker.  Dkt. No. 77 ¶ 7.  In the fall of 2011, when Santé closed out investments in Fund II, it issued Rhee a $200,000 discretionary bonus that was paid over the following 12 quarters.  Dkt. No. 77 ¶ 8; Dkt. No. 78-1 ¶ 5.  Rhee had contacted the Pennsylvania Public School Employees' Retirement Systems ("PSERS") as a potential investor in Fund II, but PSERS did not invest.  Dkt. No. 77 ¶ 12; Dkt. No. 78-4 at 28–30.  The parties dispute Plaintiff's activities between 2012 and 2017, with Defendant stating only that she "continued to work in the same role" with no additional description of what her activities were or what the precise contents of her prior role was, Dkt. No. 77 ¶ 9; Dkt. No. 78-1 ¶ 6, and Plaintiff stating that "[Defendant] was not actively fundraising from 2012 to 2017," Dkt. No. 79 ¶ 9; Dkt. No. 79-1 ¶ 9.

---

[2] The portions of Plaintiff's response to this paragraph in Defendant's Rule 56.1 Statement arguing that there was not a subsequent modification based on the Employment Agreement's purported illegality does not controvert the statement that Defendant at some point concluded that the Employment Agreement was illegal.  Dkt. No. 79 ¶ 5.

Plaintiff eventually focused her efforts on raising capital for a subsequent Fund III.  Dkt. No. 77 ¶ 9; Dkt. No. 78-1 ¶ 6.  In 2019, Rhee was contacted by Patrick Knapp of PSERS in connection with a potential investment in Fund III.  Dkt. No. 77 ¶ 13; Dkt. No. 78-4 at 45; Dkt. No. 78-5 at 17–18.  Rhee's initial involvement with PSERS's investment in Fund III consisted of qualifying PSERS as an investor.  The process of qualification included contacting PSERS and providing information about Santé, finding the right people within PSERS to receive information about Santé, maintaining contact with PSERS during the process, and introducing Knapp to Kevin Lalande, Santé's founder, and others within Santé.  Dkt. No. 77 ¶ 14; Dkt. No. 78-4 at 45–46, 72–74.  Plaintiff asked "Knapp what his intention was in terms of receiving the information about [Fund] III and what he does within the organizations, what his backgrounds were and the structures," and described the "process of how—if they were to have an interest with investing with us, what it would look like and timeline will be."  Dkt. No. 78-4 at 46.  Those qualifications include the "type of institution, size and other portfolios that have invested in the past, as well as their mandates."  *Id*. at 74.  Plaintiff participated in at least three calls between PSERS and Lalande and also participated in separate conversations with PSERS without Lalande present.  *Id*. at 46–47.  She did not negotiate the terms of PSERS's participation in Fund III.  *Id.* at 47.  Plaintiff also provided support closing the transaction, which consisted of "hav[ing] the right people directed to the right person within Santé" and "aiding with the other meetings up until . . . negotiations or . . . other legal discussions."  *Id*. at 74.  She helped with "continuing the conversations, follow-ups, sending whatever materials they have requested as well as leading . . . [an] in-person visit of Patrick to Santé's office so they can go through due diligence."  *Id*. at 74–75.  To assist with "due diligence," she arranged a visit to Defendant's office for PSERS to meet

with various individuals.  *Id*. at 75.  On or about December 19, 2018, PSERS agreed to invest in Fund III and Fund IV.  Dkt. No. 79 ¶ 14.

In March 2020, Lalande informed Plaintiff via letter ("Bonus Letter") that Defendant was going to pay her a discretionary bonus of $300,000 in a lump sum and a carried interest grant of 0.50% in Fund III.  Dkt. No. 77 ¶ 18; Dkt. No. 78-1 ¶ 7; Dkt. No. 80-2.  The Bonus Memo provides that "[t]he specific details and vesting schedule of the carried interest are set forth in the applicable Transfer and Admission Agreement."  Dkt. No. 80-2.  Plaintiff was unable to complete the agreement and she was never paid the carried interest grant.  Rhee's employment with Santé was terminated in July 2020 before she was paid the carried interest grant; the record is disputed as to whether she was terminated or if she resigned.  Dkt. No. 77 ¶ 20; Dkt. No. 78-1 ¶ 7; Dkt. No. 78-4 at 33.

## PROCEDURAL HISTORY

Plaintiff filed her original complaint on May 19, 2021.[3]  Dkt. No. 4.  Because the case was a second-filed action, the Court stayed the case pending the resolution of Plaintiff's motion to dismiss or transfer in the United States District Court for the Western District of Texas.  Dkt. No. 11.  Plaintiff filed her first amended complaint on July 23, 2021 to correct the basis for federal jurisdiction.  Dkt. No. 13.  On August 9, 2021, the Western District of Texas granted Plaintiff's motion to dismiss on the basis of a lack of personal jurisdiction without prejudice to refiling in another jurisdiction.  Dkt. No. 19; *see also SHVMS, LLC v. Youngjoo "Julia" Rhee*, Case No. 21-cv-486 (W.D. Tex. Aug. 9, 2021), Dkt. No. 11.  Plaintiff filed her second amended complaint on September 3, 2021.  Dkt. No. 23.  On September 27, 2021, Defendant filed its motion to dismiss, including a supporting memorandum of law and declaration.  Dkt. Nos. 26–

---

[3] Plaintiff initially filed her original complaint on May 12, 2021, but the filing was rejected due to a filing error.  Dkt. No. 1.

27.  Plaintiff filed her opposition to the motion to dismiss on October 27, 2021.  Dkt. No. 31.

Plaintiff then sought leave to file the TAC on October 27, 2021, Dkt. No. 32, which the Court

granted on November 19, 2021, Dkt. No. 37.

Plaintiff filed the TAC on December 10, 2021.  Dkt. No. 42.  On December 13, 2021, the

Court denied as moot the motion to dismiss.  Dkt. No. 43.  Defendant filed another motion to

dismiss on December 23, 2021, including a supporting memorandum of law and declaration.

Dkt. Nos. 44–47.  On January 27, 2022, Plaintiff filed her opposition to the motion to dismiss.

Dkt. No. 52.  Defendant filed its reply in support of the motion to dismiss on February 10, 2022.

Dkt. No. 55.  On February 28, 2022, the Court granted in part and denied in part the motion to

dismiss, leaving only Plaintiff's claims for breach of contract, unjust enrichment, and breach of

fiduciary duty.  Dkt. No. 56.  Defendant subsequently filed its answer to the TAC on March 14,

2022.  Dkt. No. 61.

On November 18, 2022, Defendant filed its motion for summary judgment and

supporting memorandum of law, Rule 56.1 statement, and an affirmation.  Dkt. Nos. 75–78.

Plaintiff filed her response in opposition to the motion and accompanying exhibits on

December 9, 2022.  Dkt. Nos. 79–81.  Defendant filed its reply in support of the motion for

summary judgment on December 20, 2022.  Dkt. No. 85.  Plaintiff submitted additional exhibits

that had "technical issues" on December 28, 2022.  Dkt. No. 86.  Defendant filed a letter

correcting a statement in its reply memo on January 4, 2023.  Dkt. No. 87.  The Court held oral

argument on the motion on May 4, 2023.  Dkt. No. 88.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might

affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (internal quotation marks omitted).  "[I]n assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  But if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

Local Civil Rule 56.1 of the Local Rules for the Southern District prescribes the manner and method in which a party is to present undisputed issues of fact to the Court.  The moving

party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. Loc. Civ. R. 56.1(a). The party opposing the motion must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." S.D.N.Y. Loc. Civ. R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." S.D.N.Y. Loc. Civ. R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." S.D.N.Y. Loc. Civ. R. 56.1(c).

Pursuant to Local Civil Rule 56.1, the movant's "statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record." *Knight v. N.Y.C. Hous. Auth.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007); *see*, *e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded); *see also N.Y. Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648–49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying [Northern District of New York's analogue to S.D.N.Y. Loc. Civ. R. 56.1] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant "offered mostly conclusory denials of [movant's] factual assertions and failed to include

any record citations"); *Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."). A court "'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)). However, the district court "may in its discretion opt to conduct an assiduous review of the record." *Id.*; *see also W.D. v. Rockland Cnty.*, 521 F. Supp. 3d 358, 372 (S.D.N.Y. 2021) ("Whereas the Court need only consider the cited materials, the Court may also rely on evidence in the record even if uncited."); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## DISCUSSION

The Court addresses each of the claims in turn: (1) breach of contract, (2) unjust enrichment, and (3) breach of fiduciary duty. For the following reasons, the Court denies summary judgment on the breach of contract claim and grants summary judgment on the unjust enrichment and breach of fiduciary duty claims.

## I.    Breach of Contract

Defendant argues that the breach of contract claim must be dismissed because the Employment Agreement, under which Plaintiff was to be paid commission for raising funds, would require illegal performance because Plaintiff was not registered as a "broker" or "associated with a broker" as required by SEC regulations during the relevant time period. Dkt. No. 76 at 6–8. Plaintiff counters, *inter alia*, that a limited partnership interest does not constitute a "security" within the meaning of the Securities Exchange Act of 1934 ("Exchange Act"), Dkt. No. 79 at 11, and that she did not act as a "broker," but rather as a "finder," *id.* at 12. Plaintiff

also raises, for the first time in her opposition motion, a claim based on a breach of the duty of

good faith and fair dealing.  *Id*. at 12–13.  For the following reasons, the Court denies summary

judgment on the breach of contract claim because Defendant has not shown undisputed facts that

Plaintiff operated as a broker, rather than as a finder.

Section 15(a) of the Exchange Act makes it unlawful for a broker or dealer to "effect"

transactions in the purchase or sale of securities unless they are registered pursuant to SEC

regulations.  The provision provides the following:

> It shall be unlawful for any broker or dealer which is either a person other than a
> natural person or a natural person not associated with a broker or dealer which is a
> person other than a natural person . . . to make use of the mails or any means or
> instrumentality of interstate commerce to effect any transactions in, or to induce or
> attempt to induce the purchase or sale of, any security . . . unless such broker or
> dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).  Section 3(a)(4)(A) of the Exchange Act defines a "broker" as one who is

"engaged in the business of effecting transactions in securities for the account of others."

15 U.S.C. § 78c(a)(4)(A).

The Exchange Act also has a provision, Section 29(b), that "codif[ies] the common law

doctrine invalidating contracts that violate [its] respective provisions."  *Couldock & Bohan,*

*Inc. v. Societe Generale Sec. Corp.*, 93 F. Supp. 2d 220, 228 (D. Conn. 2000).  That provision

states:

> Every contract made in violation of any provision of this chapter or of any rule or
> regulation thereunder, and every contract (including any contract for listing a
> security on an exchange) heretofore or hereafter made, the performance of which
> involves the violation of, or the continuance of any relationship or practice in
> violation of, any provision of this chapter or any rule or regulation thereunder,
> shall be void (1) as regards the rights of any person who, in violation of any such
> provision, rule, or regulation, shall have made or engaged in the performance of
> any such contract . . . .

15 U.S.C. § 78cc(b); *see also EMA Fin., LLC v. AppTech Corp.*, 2022 WL 4237144, at *6

(S.D.N.Y. Sept. 13, 2022).  The common law principle of the defense of illegality requires that

"the contract would be invalid . . . where the contract was made illegally or requires illegal performance." *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *3 (S.D.N.Y. Aug. 7, 2014). Courts have construed Section 29(b) as "render[ing] void those contracts which by their terms violate the [Exchange] Act or the rules and regulations thereunder, for it is only such contracts which are 'made in violation of,' or 'the performance of which involves the violation of' the statute and the rules and regulations thereunder.'" *Drasner v. Thomson McKinnon Sec., Inc.*, 433 F. Supp. 485, 501–02 (S.D.N.Y. 1977) (internal citations omitted); *see also Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) (same); *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984) (same).[4]

Plaintiff attempts to escape the defense of illegality in two ways. First, Plaintiff challenges whether a limited partnership interest falls within the definition of a "security" in the Exchange Act. Presumably, Plaintiff intends to argue that if the limited partnership interest does not constitute a security, then Plaintiff would not have been required to register as a broker under the Exchange Act for her activities. That challenge is meritless. The definition of a security includes an "investment contract." 15 U.S.C. § 78c(a)(10). The Supreme Court outlined the test for defining an "investment contract" in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), and the Second Circuit concluded, in an opinion written by Judge Henry Friendly in *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59 (2d Cir. 1983), that "a limited partnership interest generally is a security because such an interest involves investment 'in a common enterprise with profits to come solely

---

[4] Unlike circumstances in which Section 29(b) may not apply because the contract allows discretion to avoid, or does not require, illegal performance, *see*, *e.g.*, *AppTech Corp*., WL 4237144, at *8, there is no contention that the contract would not require payment for the performance of illegal activity if Plaintiff was indeed operating as an unregistered broker. Indeed, any contention that such a bonus was discretionary would undermine Plaintiff's claim for breach of contract. The Employment Agreement includes no discretionary language on this basis and describes the cash bonus provision as one of its terms of employment. Dkt. No. 42-1.

from the efforts of others,'" *id*. at 65 (quoting *Howey Co.*, 328 U.S. at 301).  The Second Circuit

noted that "[w]here the investing limited partners exercised no managerial role in the

partnership's affairs, courts have held that limited partnership interests are securities, at least

when, as here, there were a considerable number of limited partners." *Id.* (citations omitted).

That conclusion is also supported by decisions of other circuits.  *See Sec. & Exch. Comm'n v.*

*Arcturus Corp.*, 928 F.3d 400, 410 (5th Cir. 2019) (stating that "[w]ithout any significant

powers, a limited partner is like 'a stockholder in a corporation,'" and "[a]s a result, 'limited

partnership interests may be considered a security'" (quoting *Youmans v. Simon*, 791 F.2d 341,

346 (5th Cir. 1986))); *Goodman v. Epstein*, 582 F.2d 388, 408 (7th Cir. 1978) (stating that there

is "weighty authority for considering a limited partnership interest to be 'security' within the

protective scope of the federal securities laws").

      In applying the four factors under the *Howey* test, the Court sees no reason to depart from

this precedent in the case of the limited partnership interests in Santé funds.[5]  Plaintiff does not

address, in her briefing, whether the limited partnership interests may constitute an "investment

contract."  An investment contract is a "scheme whereby a person [1] invests his money [2] in a

common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a

third party."  *Howey*, 328 U.S. at 298–99; *see also S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d

169, 183 (S.D.N.Y. 2020) ("*Howey* is an objective test that provides the flexibility necessary for

the assessment of a wide range of investment vehicles.").  All of these elements are met for the

limited partnership interests in Santé Funds III and IV.  It is undisputed that PSERS invested a

---

[5] Neither party provides facts in their Rule 56.1 Statements concerning the nature of the
securities.  The Court exercises its discretion to assess the record for the limited purpose of
determining whether the limited partnership interests constitute "securities" under the *Howey*
test.

total of $150 million in both Fund III and Fund IV simultaneously, with each fund receiving $75 million.  Dkt. No. 81-1.  Those funds were common enterprises, as PSERS's investment was pooled with others as a "share of the overall fund."  *Id.*  The General Partner "strategically acquire[d] substantial ownership positions in portfolio companies through tranched investments, which . . . dr[ove] the potential to return the entire Fund," Dkt. No. 80-8 at ECF p.7, and therefore the fortunes of each investor in Fund III and Fund IV "depend[ed] on the profitability of the enterprise as a whole," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).  PSERS also clearly had an expectation of profits from the companies that the funds invested in.  Part of its rationale for the investment was the "market opportunity" in healthcare and the "prolific" "last decade" in "healthcare venture investment."  Dkt. No. 80-8 at ECF p. 4.  The recommendation to invest was premised on the "strong, top quartile performance on a net IRR and multiple basis" from Santé Fund II.  *Id.* at ECF pp. 7–8.  Those profits were solely from the efforts of Santé and the companies that it invested in.  *Id.* at ECF p. 8.  Finally, there is no indication in the summary judgment record that the limited partners were anything other than passive.  The responsibility for management of the fund fell to the General Partner.  *See id.* at ECF pp. 7–8.  In short, the limited partners were "left unable to exercise meaningful control over [their] investment."  *United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (quoting *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003)).  The limited partnership interests in Fund III and Fund IV thus constituted securities within the meaning of the Exchange Act.  *See also Sec. & Exch. Comm'n v. Xia*, 2022 WL 17539124, at *19 (E.D.N.Y. Dec. 8, 2022) (applying *Mayer* and *Howey* to find that the limited partnership interest at stake in that case constituted securities).

Plaintiff's second argument is that a reasonable jury could find that she was not acting as a "broker," but rather as a "finder," and therefore was not required to be registered and may

receive transaction-based compensation.  Defendant contends that the undisputed facts refute that Plaintiff acted only as a finder.  Dkt. No. 85 at 3.[6]  For the following reasons, the Court concludes that Defendant has failed to marshal enough facts in its Rule 56.1 Statement to establish that Plaintiff acted as a broker.

As noted, the Exchange Act broadly states that a "broker" is "any person *engaged in the business* of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(a)(4)(A) (emphasis added).  Those general words require interpretation, for which resort to context and purpose is necessary.  *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[W]e must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (internal quotation marks and citation omitted)); *see also Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 948 (2023) (noting the "duty to construe statutes, not isolated provisions" and to read words "in their context and with a view to their place in the overall statutory scheme" (citations omitted)).  When that definition is construed in context, it becomes evident that it is not enough that a person merely effects a transaction in securities, or induces or attempts to induce the purchase or sale of a security, for that person to be a broker.  Section 15(a) of the Exchange Act makes it unlawful for a "broker" to "effect any transactions in, or to induce or attempt to induce the purchase or sale of any, security" unless such broker is registered.  15 U.S.C. § 78o(a)(1).  The word "broker" and the very definition of a "broker" under the Exchange Act would be surplusage if any person who effected a transaction in a security or induced or attempted to induce the purchase of a security was, by virtue of that fact alone, a broker.   The statute requires more for a person to be a broker.

---

[6] Defendant also argued that Plaintiff had raised the finder's exception for the first time in her opposition brief, but later corrected that statement by letter submission.  Dkt. No. 87.

The broker-dealer registration requirement, and its attendant supervision, are intended to ensure that "securities are only sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells." *Roth v. S.E.C.*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (alteration accepted) (quoting *Persons Deemed Not to Be Brokers*, Exchange Act Release No. 20,943 (May 9, 1984), 49 Fed. Reg. 20512, 20515 (1984)). To that end, "[a] broker-dealer that has registered with the Commission is bound to abide by numerous regulations designed to protect prospective purchasers of securities, including standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations over broker-dealer employees." *Id.*; *see also EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 58 (1st Cir. 2021) (describing the requirement); *Turbeville v. Fin. Indus. Regul. Auth.*, 874 F.3d 1268, 1270 (11th Cir. 2017) (describing the purpose of the membership and conduct rules of the national securities associations under which a broker must register); *Lawrence v. Richman Grp. Cap. Corp.*, 358 F. Supp. 2d 29, 36 (D. Conn. 2005), *on reconsideration*, 2005 WL 1949864 (D. Conn. Aug. 11, 2005) ("Once registered, a broker-dealer is required to comply with specific record keeping, financial compliance, and financial reporting requirements. The record keeping provisions require maintenance of numerous records regarding, among other matters, securities transactions, positions held in securities, ordered received and given, as well as the receipt and disbursement of various funds." (citation omitted)). The broker registration requirement has been described as the "keystone of the entire system of broker-dealer regulation." *Roth*, 22 F.3d at 1109 (citation omitted).

The statute, read as a whole, thus implies that a broker is one whose activities in effecting securities transactions or attempting to do so is more than fleeting or serendipitous. The conduct

in effecting a transaction must show engagement with a "business."  Moreover, the business must be one of "effecting" transactions in securities and not merely in making introductions among parties that may or may not ultimately result in a securities transaction.  The determination of whether an individual is engaged in the business of effecting securities transactions, sufficient to qualify as a "broker," is often a "fact-specific inquiry" guided by these statutory objectives.  *Dervan v. Gordian Grp. LLC*, 2017 WL 819494, at *10 (S.D.N.Y. Feb. 28, 2017) (Nathan, J.).  To determine whether a person may be acting as a "broker," courts have looked to whether the person:

> 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors.

*SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984); *see also United States Sec. & Exch. Comm'n v. Collyard*, 861 F.3d 760, 766 (8th Cir. 2017) (same); *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005) (same); *S.E.C. v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (same); *S.E.C. v. StratoComm Corp.*, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014), *aff'd sub nom. Sec. & Exch. Comm'n v. StratoComm Corp.*, 652 F. App'x 35 (2d Cir. 2016) (defining three factors as "(1) solicitation of investors to purchase securities; (2) involvement in negotiations between the issuer and the investor; and (3) receipt of transaction based compensation." (citing *SEC v. Gagnon*, 2012 WL 994892, at *11 (E.D. Mich. March 22, 2012))).

In determining whether a particular individual or entity falls within this definition, courts have emphasized the issue of whether the conduct of the individual may be "characterized by 'a certain *regularity of participation* in securities transactions at key points in the chain of distribution.'"  *Martino*, 255 F. Supp. 2d at 283 (quoting *Hansen*, 1984 WL 2413, at *10) (emphasis added); *see also S.E.C. v. Margolin*, 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30,

1992) (concluding that a person was an unlicensed broker because he, *inter alia*, "participated in dozens of transactions for various clients"); *George*, 426 F.3d at 797 (noting that the argument that the defendant was not employed by issuer of securities and suffered net loss did not "counter the SEC's proof that [defendant] was regularly involved in communications with and recruitment of investors for the purchase of securities"); 5 Law Sec. Reg. § 14:54 (Hazen, ed.) (Dec. 2022 Update) ("[C]ase law and no-action letters have outlined the fact that 'regularity of participation' is a primary indication of being 'engaged in the business' and therefore of acting as a broker-dealer."). Moreover, "[i]n order to determine whether any of these individuals (or any other person or business) is a broker, [the Court] look[s] at the activities that the person or business actually performs." *Quantum Cap., LLC v. Banco De Los Trabajadores*, 2014 WL 12519757, at *10 (S.D. Fla. Nov. 21, 2014).

In line with these statutory objectives, this District has recognized a limited "finder's exception" from registration. That exception reflects little more than an interpretation of the words "effecting transactions," that makes clear that those who "collect commissions for purely 'locating potential buyers or sellers, stimulating interest, and bringing parties together,'" *Dervan*, 2017 WL 819494, at *11 (S.D.N.Y. Feb. 28, 2017) (alterations accepted and citation omitted), are not in fact "effecting transactions." *See also Schatzki v. Weiser Cap. Mgmt., LLC*, 2016 WL 6662264, at *4 (S.D.N.Y. Nov. 9, 2016) (recognizing the existence of a finder's exception); *Antares Mgmt. LLC v. Galt Glob. Cap., Inc.*, 2013 WL 1209799, at *9 (S.D.N.Y. Mar. 22, 2013) (noting that contract at issue, on its face, did not require the "unregistered finder to perform broker services"); *Found. Ventures, LLC v. F2G, LTD.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010) (concluding that the contract aligned with finder's exception and thus did not violate the Exchange Act). That exception also finds support outside of this Circuit. *See, e.g., S.E.C. v.*

*Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011) (identifying the distinction and concluding that defendant was a mere finder); *Apex Glob. Partners, Inc. v. Kaye/Bassman Int'l Corp.*, 2009 WL 2777869, at *3 (N.D. Tex. Aug. 31, 2009) (identifying the exception); *Salamon v. Teleplus Enterprises, Inc.*, 2008 WL 2277094, at *13 (D.N.J. June 2, 2008) (stating that "the role of a finder or middleman is limited simply to bringing the parties together to consummate a transaction"); *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006) ("In a series of no-action letters, the staff of the Securities and Exchange Commission . . . has indicated that in certain limited circumstances, a person or entity may perform a narrow scope of activities without triggering broker/dealer registration requirements."); *Salamon v. CirTran Corp.*, 2005 WL 3132343, at *2 (D. Utah Nov. 22, 2005) ("A finder's exception has been recognized in case law, and in administrative decisions, particularly the SEC in its No–Action Letters.").  Therefore, "[e]ven if the 'finder' receives a fee 'in proportion to the amount of the sale'—i.e., a percentage of the total payment rather than a flat fee—the Commission (in a series of 'no-action' letters) 'has been willing to find that there was no need for registration.'"  *Kramer*, 778 F. Supp. 2d at 1336 (citation omitted).  Although the line between a "finder" and a "broker" remains elusive, the case law indicates that certain activities—such as merely providing information or bringing two sophisticated parties together—do not implicate the objectives of investor protection under the Exchange Act and do not constitute effecting a securities transaction.[7]  *See, e.g.*, *Kramer*, 778 F. Supp. 2d at 1338

---

[7] Plaintiff offered an alternate definition at oral argument, arguing that a broker is a business and not a natural person and that, because Plaintiff engaged in her activities as an employee, it was only her employer and not Plaintiff herself who would be required to register as a broker.  That argument runs afoul of the plain language of Sections 3(a)(4)(A) and 15(a) of the Exchange Act.  Section 3(a)(4)(A), the definitional provision of the Exchange Act, defines a broker as "any person engaged in the business of effecting transactions in securities for the accounts of others," 15 U.S.C. § 78c(a)(4)(A), and Section 3(a)(9) defines a "person" to include a "natural person,"

(finding that the defendant was a finder because his "conduct consisted of nothing more than bringing together the parties to a transaction."); 5 Law Sec. Reg. § 14:54 ("Definitions of Broker and Dealer") ("Merely providing information that may facilitate investors will not classify the provider as a broker-dealer."); *see also* Black's Law Dictionary 707 (9th ed. 2009) (stating that a "finder merely brings two parties together to make their own contract, while a broker-dealer usu[ally] participates in the negotiations").

That courts have found finders to be able to earn transaction-based fees without violating the Exchange Act's registration requirements reflects the broader rule that "[c]ommission-based payment, standing alone, is not dispositive of whether a party acts as a broker-dealer under the Exchange Act." *Quantum Cap., LLC v. Banco de los Trabajadores*, 2016 WL 10536988, at *7 (S.D. Fla. Sept. 8, 2016); *see also Kramer*, 778 F. Supp. 2d at 1339 ("Kramer's receiving transaction-based compensation for introducing Talib to Skyway cannot, without additional evidence, qualify Kramer [as] a broker under Section 15(a)."). That said, "receipt of [transaction-based] compensation militates, perhaps strongly, in favor of a conclusion" that one functioned as a broker-dealer. *Dervan*, 2017 WL 819494, at *11; *see also Neogenix Oncology, Inc. v. Gordon*, 133 F. Supp. 3d 539, 559 (E.D.N.Y. 2015) (Bianco, J.) (stating that the "receipt of transaction-based compensation . . . is significant" in this analysis). The SEC has also tended

---

*id*. § 78c(a)(9). Section 15(a) expressly contemplates that a natural person can be a broker. It speaks in the alternative to the requirements with respect to registration for a broker or dealer, which is "a person other than a natural person" and a broker dealer who is "a natural person." 15 U.S.C. § 78o(a)(1). Thus, the fact that Plaintiff is a "natural person" does not relieve her of the requirement either of being registered or being associated with a broker who is registered. In fact, the SEC has taken the position that there are circumstances in which the employees of an issuer may be brokers, but the issuer (because it is selling its own securities) would not be a broker. *See* 15 Broker-Dealer Reg. §§ 1:8–1:13 (Lemke and Lins, eds.) (Dec. 2022 Update) (noting distinction between issuer that sells its own securities to register as a broker, and the need for issuer's employees to register).

to caveat its language in no action letters, indicating that a transaction-based fee is not dispositive of broker status. *See*, *e.g.*, *Brumberg, Mackey & Wall, P.L.C.*, 2010 WL 1976174, at *3 (S.E.C. No-Action Letter May 17, 2010) (noting that a person "receiving transaction-based compensation in connection with another person's purchase or sale of securities *typically* must register as a broker-dealer or be an associated person of a registered broker-dealer" (emphasis added)).

New York State law indicating when a party may be entitled to a "finder's fee" provides additional indicia for when a finder may be distinguished from a broker. *See, e.g.*, *Warshay v. Guinness PLC*, 750 F. Supp. 628, 636 (S.D.N.Y. 1990), *aff'd*, 935 F.2d 1278 (2d Cir. 1991) ("Finders, unlike brokers, do not play a role in the negotiation, drafting and signing of a purchase agreement and closing documents."); *Train v. Ardshiel Assocs., Inc.*, 635 F. Supp. 274, 279 (S.D.N.Y.), *aff'd sub nom. Train v. Ardshiel Assoc.*, 805 F.2d 391 (2d Cir. 1986) ("Finders find potential buyers or sellers, stimulate interest and bring parties together. Brokers bring the parties to an agreement on particular terms. The distinction is that finders do not have to negotiate the transaction to earn their fee." (internal citations omitted)). Although the statutory purposes undergirding finder's fees cases and the Exchange Act do not perfectly align, those cases are instructive (if not dispositive) in defining the contours of when a finder has impermissibly acted as an unregistered broker. Cases concerning the Exchange Act have drawn from finder's fee caselaw to define the scope of the exception under the Exchange Act. *See*, *e.g.*, *Dervan*, 2017 WL 819494, at *11 (citing *Antares Mgmt. LLC*, 2013 WL 1209799, at *7); *Found. Ventures, LLC*, 2010 WL 3187294, at *6.

In addressing Defendant's motion for summary judgment, the Court need not define precisely what constitutes a "business" and the distinction between a "broker" and a "finder." In

order to hold that Plaintiff was a broker as a matter of law, the Court would have to adopt an

extreme position unsupported by the law.  The facts that are undisputed on this motion that

Defendant claims entitle it to summary judgment are limited to the following:

> In her role as Director of Marketing and Investor Relations, Rhee contacted potential investors for Santé's Fund II between 2010 and 2011.

Dkt. No. 77 ¶ 6.

> Rhee's initial involvement with PSERS's investment in Fund III consisted of qualifying PSERS as an investor – which included Rhee contacting PSERS and providing information about Santé, finding the right people within PSERS to receive information about Santé, maintaining contact with PSERS during the process, and introducing Knapp to Lalande, Santé's Founder, and others within Santé.

*Id.* ¶ 14.

> Rhee's involvement in closing PSERS's investment in Fund III consisted of the following: directing PSERS to the right people within Santé, aiding with meetings between Santé and PSERS, continuing conversations, follow-ups, sending materials requested by PSERS, and being involved in the due diligence process.

*Id.* ¶ 16.  And:

> Rhee thinks she is entitled to compensation based on the amounts PSERS invested with Santé.

*Id.* ¶ 17.

> Defendant also argues that the following is undisputed:

> Following the closure of Fund II, Rhee continued to work in the same role for Santé and focused her efforts on raising capital for Santé's Fund III.

*Id.* ¶ 9.  Plaintiff, however, disputes this paragraph, stating that "Santé was not actively

fundraising between 2012 and 2017 since it had no fund open for investment."  Dkt. No. 79 ¶ 9;

Dkt. No. 79-1 ¶ 9 (Plaintiff's affidavit).

In short, as Defendant made clear at oral argument, its legal position is that Plaintiff

would have acted in the position of a broker, and incentive-based compensation paid to her

would have been payment for illegal performance, if she made only a single introduction that resulted in a securities transaction without effecting transactions in securities being a part of her day-to-day roles and responsibilities at Santé.

Defendant's position—that Plaintiff constituted an illegal broker engaged in the business of effecting securities, based only on such loosely described and sparse facts—cannot be squared with the statutory language of the Exchange Act's broker requirements and their purpose. It is not enough under the Exchange Act that a person qualified a single investor, connected them to familiar coworkers, maintained contact, and sent undescribed materials to them. Dkt. No. 77 ¶¶ 14, 16. The SEC has long identified that a "[r]egistration of employees of an issuer, as opposed to registration of the issuer itself, usually warrants a case-by-case analysis." 15 Broker-Dealer Reg. § 1:8 (Lemke and Lins, eds.) (Dec. 2022 Update). Defendant's Rule 56.1 Statement offers no undisputed facts bearing on Plaintiff's "regularity of participation in securities transactions," *Martino*, 255 F. Supp. 2d at 283. Although it is undisputed that Rhee contacted potential investors for Santé's Fund II between 2010 and 2011, Dkt. No. 77 ¶ 6, Defendant offers no undisputed facts regarding how many investors she contacted, whether contact with new investors was a large or small part of her job responsibilities, the nature of her contact with investors, and how much of her compensation—if any—was based on her contact with new investors. All that is stated is the naked and conclusory fact that she "contacted potential investors." *Id*. ¶ 6. Moreover, although Paragraph 9 of Defendant's Rule 56.1 Statement refers to Plaintiff's prior role for Santé following the close of Fund II, the Rule 56.1 Statement describes nothing about Plaintiff's role when there was not an anticipated fund or when fundraising was not in effect. No information is provided about whether Plaintiff was engaged

full-time or part-time in contacting new investors, and what else—if anything—she did to earn her base compensation.

Furthermore, even with respect to the PSERS transaction, Defendant does not identify undisputed evidence that Plaintiff exercised discretion or engaged in sales or negotiating activities through any of this conduct.  As Defendant essentially admitted at argument, qualification was almost a mechanical process.  Santé established the criteria for investment. From the record on this motion, it would have been sufficient for Plaintiff just to check that those criteria were satisfied, with Santé undertaking the substantive negotiations.  The paragraphs in the Rule 56.1 Statement include no details of the conversations that Plaintiff had with PSERS. No facts are provided about the "information" that she conveyed.  No description is provided of the conversations she had when she was "maintaining contact" or "continuing conversations" or "follow-ups."  In short, the Rule 56.1 Statement simply provides no details on the content of her behavior.  The paragraphs do not show, for example, that Plaintiff was seeking to persuade or maximize sales, as opposed to merely directing interested individuals to the right people within Santé—*i.e.*, precisely what a "finder" might do, or frankly what anyone in the front office at Santé who received outreach from an interested outside investor might do.  The Rule 56.1 Statement also indicates that Plaintiff was "connected by Patrick Knapp of PSERS," *id.* ¶ 13, which could support a jury conclusion that she did not actively prompt the connection with PSERS for Fund III.  While the Rule 56.1 Statement indicates that she was "involved in the due diligence process," Dkt. No. 77 ¶ 16, the statement does not describe what that means.

The positions taken by the SEC in no-action letters, although not precedential, have the power to persuade.  *See Allaire Corp. v. Okumus*, 433 F.3d 248, 254 (2d Cir. 2006) ("The SEC no-action letter does not bind us, but we find it persuasive."); *Lindner v. Am. Exp. Co.*, 2011 WL

2581745, at *4 (S.D.N.Y. June 27, 2011) ("While SEC no-action letters have no precedential effect, they may be treated as persuasive."), *report and recommendation adopted*, 2011 WL 3664356 (S.D.N.Y. Aug. 19, 2011).  The SEC has considered whether an employee has responsibilities other than sales responsibilities to be critical in considering whether the employee is a broker.  *See* 15 Broker-Dealer Reg. § 1:11 ("Demonstrating that employees have duties other than the sale of securities and/or that the employee is fulltime and permanent is a critical aspect to proving that the employee is not a broker temporarily serving on an issuer's payroll.").  The SEC has also considered it to be important whether the employee was involved in a negotiation or in substantive conversations about the purchase of a security.  *See*, *e.g.*, *Russell R. Miller & Co., Inc.*, 1977 WL 10938 (S.E.C. No-Action Letter Aug. 15, 1977) (recommending no action when compensation was based on percentage of consideration paid, given that party was not involved in a negotiation or dealing substantively with the other party on behalf of its client following identification); *Int'l Bus. Exch. Corp.*, 1986 WL 67535, at *1 (S.E.C. No-Action Letter Dec. 12, 1986) (recommending no action when party's role was limited to transmitting documents during negotiations, but was still compensated on the basis of selling price).  The SEC also has considered it to be important whether the employee made a recommendation or merely passed only information without any apparent endorsement.  *See*, *e.g.*, *Fin. Charters & Acquisitions, Inc*., 1984 WL 45923, at *1 (S.E.C. No-Action Letter Nov. 25, 1984) (recommending no action when, *inter alia*, "[a]t no time would either Financial or Hirshen discuss or recommend the use of any particular hedging strategy or strategies"); 15 Broker-Dealer Reg. § 1:16 ("[M]aking recommendations increases the likelihood that registration would be required.").  Thus, simply setting up a meeting for due diligence, without

conducting any herself, might not be enough for Plaintiff to be acting as a broker.[8]  *See, e.g.*,

*Kramer*, 778 F. Supp. 2d at 1339 (concluding that an introduction alone was not enough to

qualify defendant as a broker under Section 15(a)); *Teleplus Enterprises, Inc.*, 2008 WL

2277094, at *8 (concluding that mere introductions were not enough to grant summary

judgment).  Defendant's Rule 56.1 Statement leaves all of these factors—Plaintiff's other

responsibilities, Plaintiff's participation in negotiations, the substantive nature of Plaintiff's

conversations—as blanks.  *See Holtz*, 258 F.3d at 73 (stating that a court "is not required to

consider what the parties fail to point out in their Local Rule 56.1 statements" (citation omitted)).

Thus, there is a triable issue as to whether Plaintiff acted as a broker.  *See Quantum Cap.,*

*LLC*, 2016 WL 10536988, at *5 (concluding that an issue concerning application of the broker-

dealer distinction under Florida law, which looks to the Exchange Act for guidance, was a

question of fact that should be determined by the jury); *Teleplus Enterprises, Inc.*, 2008 WL

2277094, at *9 ("A factual determination will be necessary to determine Salamon's status in

these negotiations: Was he a broker or a finder?"); *CirTran Corp.*, 2005 WL 3132343, at *3

("The Court believes that there is a material issue of fact as to whether Salamon is acting as a

finder or a broker-dealer under the state and federal securities law.").[9]

---

[8] Defendant, at oral argument, relies on the SEC no-action letter in *Brumberg, Mackey & Wall,*
*P.L.C.*, 2010 WL 1976174.  Those facts are not analogous here.  First, the business entity
requesting assurance of a no action letter was retained entirely for the purpose of "acquisition of
funding for financing" pursuant to a "Referral Fee Agreement" in which they were to be wholly
compensated by Referral Fees that consisted of a percentage of the total funding raised.  Here,
Plaintiff also received an Annual Base Compensation and there is a dispute of fact regarding the
extent of which her role and activities involved fundraising or also involved other activities on
behalf of her employer.  Dkt. No. 78-2 at ECF p. 1.  Further, the SEC's determination was based
on its assumption that there would be "pre-selling" of the securities.  *Brumberg, Mackey & Wall,*
*P.L.C.*, 2010 WL 1976174, at *2.  Here, Defendant provided no facts in its Rule 56.1 Statement
as to the content of any discussions, precluding any finding that such "pre-selling" activities took
place.
[9] Plaintiff also raises, for the first time in its opposition brief, a new claim on the basis of the

## II.     Unjust Enrichment

Defendant argues that Plaintiff's unjust enrichment claim must be dismissed because it is duplicative of her breach of contract claim, which is premised on a void and illegal contract. Dkt. No. 76 at 8–9.  Further, Defendant argues that Plaintiff has not shown that she engaged in services that exceeded the scope of her duties such that the compensation she received did not constitute reasonable value for the services provided.  *Id*. at 9–10.  The Court grants summary judgment dismissing the claim.

"To prevail on a claim of unjust enrichment, a party must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  *Caro Cap., LLC Caro Partners, LLC v. Koch*, 2022 WL 463338, at *14 (S.D.N.Y. Feb. 14, 2022).  "The essential inquiry . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."  *Paramount Film Distrib. Corp. v. State of N.Y.*, 285 N.E.2d 695, 698 (N.Y. 1972).  "Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent."  *Id*.  "Courts applying New York law require a plaintiff to allege some expectation

---

implied covenant of good faith and fair dealing.  But no mention is made of the covenant of good faith and fair dealing in the TAC.  "[T]he central purpose of a complaint is to provide the defendant with notice of the claims asserted against it," *Greenidge v. Allstate Ins. Co*., 446 F.3d 356, 361 (2d Cir. 2006) (Sotomayor, J.), and "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint," *Smith v. City of New York*, 385 F. Supp. 3d 323, 338 (S.D.N.Y. 2019) (quoting *Shah v. Helen Hayes Hosp*., 252 F. App'x 364, 366 (2d Cir. 2007) (summary order)).  Plaintiff has failed to put Defendant on notice in its TAC that it would raise a claim based on the breach of an implied covenant of good faith and fair dealing. Plaintiff may not amend its complaint, for a fourth time, through its papers in opposition to the motion for summary judgment.  The Court thus grants summary judgment with respect to that claim.

of compensation that was denied in order to demonstrate that equity requires restitution." *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 740 (S.D.N.Y. 2012). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 381 (4th Dep't 1999)).

The unjust enrichment claim is either premised on an illegal contract or is duplicative of the breach of contract claim. If Defendant prevails at trial showing that the contract requires illegal performance, then the illegality of the contract would preclude the recovery of damages under an equitable theory for those same terms. *See, e.g.*, *Lawrence v. Richman Grp. Cap. Corp.*, 2005 WL 3448056, at *3 (D. Conn. Dec. 15, 2005), *aff'd sub nom. Lawrence v. Richman Grp. of Connecticut, LLC*, 199 F. App'x 55 (2d Cir. 2006) ("[T]he purpose of the Securities Exchange Act, including Sections 78o and 78cc(b), to institute a regulatory scheme for the long-range protection of investors, would be thwarted if brokers could ignore registration requirements, conduct their business, and then recover compensation for services rendered under equitable theories such as unjust enrichment."); *Lawrence v. Richman Grp. of Connecticut, LLC*, 407 F. Supp. 2d 385, 393 (D. Conn. 2005) (same); *Hartman v. Harris*, 810 F. Supp. 82, 85 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993) (noting that "quasi-contractual claims such as those against Harris are subject to the same rules regarding illegality" and dismissing unjust enrichment claims); *Segrete v. Zimmerman*, 413 N.Y.S.2d 732, 733 (2d Dep't 1979) (dismissing unjust enrichment claim based on work provided by unlicensed contractor); Restatement (Second) of Contracts § 197 (1981) ("[A] party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy unless denial of restitution would cause disproportionate forfeiture."); *see also Regional*

*Props., Inc. v. Fin. & Real Estate Consulting Co*., 678 F.2d 552, 564 (5th Cir. 1982) (holding that an unregistered broker who performed an illegal contract could not recover for his services under an equitable theory, because otherwise the contract-voiding provision in 15 U.S.C. § 78cc(b) would be "a toothless tiger").

Alternatively, if Plaintiff prevails at trial showing that the contract was legal, then her unjust enrichment claim would be entirely duplicative of the breach of contract claim. Even if Plaintiff was not a broker and the agreement was subsequently modified—an issue to be determined at trial—Plaintiff would only be entitled to the terms under the modified agreement. Alternatively, if it was not modified, Plaintiff would be entitled to the terms under the Employment Agreement. Either way, Plaintiff's expectation would be set by the agreement in place. Plaintiff, in her briefing, even relies on the Employment Agreement to support her expectation under her unjust enrichment claim. She states that her eventual bonus was "a rounding error compared to what Ms. Rhee was *entitled to under the Offer Letter*."[10] Dkt. No. 79 at 15 (emphasis added); *see also* Dkt. No. 42 ¶ 49 (Plaintiff's claim for unjust enrichment in her TAC alleging that "[t]he Defendant colluded to convey the benefit of the Plaintiff's work on Defendants [sic] to the detriment of Plaintiff, without compensating the Plaintiff *as contracted*." (emphasis added)). It is well-established that "[w]here an unjust enrichment claim duplicates a

---

[10] Plaintiff also argues that she was paid less than industry standard metrics. Dkt. No. 79 at 14–15. But her argument is premised upon her being a broker. *See* Dkt. No. 79 at 15 (stating that her bonus was "massively below the industry standard success fee *for brokers* (which Santé falsely alleges she was) which is 20% of management fees and carried interest in perpetuity" (emphasis added)). As previously described, she cannot pursue an unjust enrichment claim in equity as a means of enforcing an illegal contract. Nor does anything in the record indicate that Plaintiff had expectations arising from a request for an industry-standard success fee for her PSERS efforts and that Defendant denied that request. *See Swain v. Town of Wappinger*, 2019 WL 2994501, at *18 (S.D.N.Y. July 9, 2019) ("Courts applying New York law require a plaintiff to allege some expectation of compensation that was denied in order to demonstrate that equity requires restitution." (citation omitted)).

claim for breach of a valid, enforceable contractual obligation, the unjust enrichment claim must be dismissed." *Beck v. Manhattan Coll.*, 537 F. Supp. 3d 584, 589 (S.D.N.Y. 2021); *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 512 (S.D.N.Y. 2018) (listing cases); *see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N. V.*, 400 F. App'x 611, 613 (2d Cir. 2010) (summary order) ("Unjust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists.").  "Nor can an unjust enrichment claim serve as a backstop to remedy the other claims' defects." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 473 (S.D.N.Y. 2020) (Nathan, J.).

Finally, Plaintiff offers an alternative theory.  Defendant, in its prior submissions (but not on this motion), contended that Plaintiff's written contract was modified to eliminate her entitlement to a bonus based on the funds that Plaintiff raised.  *See*, *e.g.*, Dkt. No. 46 at 5. Plaintiff has suggested that, if her written agreement is deemed modified to eliminate her entitlement to a bonus, she should still be granted that bonus on a theory of unjust enrichment. In essence, she claims that it would be unfair for Defendant to enjoy the benefits of the funds she helped secure from PSERS without paying her extra compensation for her role in securing those funds.  But that argument runs afoul of another principle of law.  An employee is not entitled to receive compensation through the vehicle of a claim of unjust enrichment for services that employee provided within the scope of her duties.  *See Levion v. Societe Generale*, 822 F. Supp. 2d 390, 405 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 62 (2d Cir. 2012) (Sullivan, J.); *Hughes v. Standard Chartered Bank, PLC*, 2010 WL 1644949, at *8 (S.D.N.Y. Apr. 14, 2010).  Plaintiff has offered no evidence that the services she provided in working with PSERS "exceeded the scope of [her] duties" as the Director of Marketing and Investor Relations. *Levion*, 822 F. Supp. 2d at 405.  Plaintiff argues merely that in her contacts with PSERS, she "went above and beyond

in the performance of her duties," Dkt. No. 79 at 14, but that hyperbole is no substitute for evidence.  While the scope of Plaintiff's duties between, and other than, raising funds was unclear, it is undisputed that one of her responsibilities was fundraising.  Dkt. No. 77 ¶ 4.  That is supported by the Employment Agreement itself, which indicates that at least one of her duties during limited periods of fundraising was precisely that—to "raise[ ]" "capital."  Dkt. No. 78-2. Plaintiff has not shown anything in the record beyond that which she was apparently already paid a salary for.  That she may have been successful at raising funds only shows her success at fulfilling her duties; not that she went above and beyond those duties.  *See*, *e.g*., *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 323 (E.D.N.Y. 2012) (stating that "a plaintiff must allege that he performed work that exceeded the scope of his duties in his position and, therefore, his salary did not constitute reasonable value for the services he provided to his employer" and concluding that plaintiff had failed that test (internal quotation marks omitted and alterations accepted)).  The Court grants summary judgment dismissing the unjust enrichment claim.

## III.    Breach of Fiduciary Duty

Finally, Defendant argues that the fiduciary duty claim must be dismissed because Plaintiff was an employee of Defendant, which does not give rise to a fiduciary duty.  Dkt. No. 76 at 10.  Plaintiff argues in response that "Rhee is a *de facto* limited partner of Santé Fund III and Fund IV" based on the Employment Agreement and the Bonus Letter.  Dkt. No. 79 at 16. For the following reasons, the Court grants summary judgment dismissing Plaintiff's fiduciary duty claim.

"To state a cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (quoting *United States Fire Ins. Co. v. Raia*, 942 N.Y.S.2d 543,

545 (2d Dep't 2012)).  "It is undisputed under New York law that general partners owe a

fiduciary duty to the limited partners of the partnership."  *Soley v. Wasserman*, 823 F. Supp. 2d

221, 232 (S.D.N.Y. 2011).  Under New York Law, "in every reported appellate-division-level

case, . . . employment relationships do not create fiduciary relationships.  Simply put, '[the

employer] did not owe plaintiff, as employee, a fiduciary duty.'"  *Rather v. CBS Corp*.,

886 N.Y.S.2d 121, 125 (1st Dep't 2009) (quoting *Angel v. Bank of Tokyo–Mitsubishi, Ltd*.,

835 N.Y.S.2d 57, 60 (1st Dept. 2007)).

Plaintiff has failed to show the existence of a fiduciary relationship.  It is undisputed that

absent any membership interest, Plaintiff and Defendant are merely in an employer-employee

relationship, which does not give rise to a fiduciary relationship.  Plaintiff's fiduciary duty claim

in her TAC is premised upon the notion that upon the payment of her discretionary bonus on

March 6, 2020, Defendant "formally made [Plaintiff] a member of SHV III, albeit at an arbitrary

level of carried interest below what was contracted."  Dkt. No. 42 ¶ 14.  She asserts that this

"created fiduciary duties owed to Ms. Rhee."  *Id*. ¶ 15.  This Court, in its Opinion and Order on

the motion to dismiss, had rejected the application of New York's statute of frauds to require

there to be a writing for Plaintiff to become a limited partner of the fund, noting that:

> The Complaint does not allege that the agreement for her to become a member in
> the fund would last for over one year.  Under the facts as alleged in the Complaint,
> the membership agreement was not required to be in writing and signed by Rhee in
> order to become effective.  Rhee has thus alleged a relationship giving risk to a
> fiduciary duty owed by the plaintiff.  She has also alleged that defendant breached
> its duty of loyalty and good faith by intentionally violating federal and state
> securities laws to enrich itself at the expense of the plaintiff, and took proceeds
> owed to Rhee for its own benefit, thereby alleging a breach of the fiduciary duty.

Dkt. No. 56 at 8.  The Court then denied the motion to dismiss on this claim.  *Id*.

On the motion for summary judgment, Plaintiff abandons any assertion that there was an

unwritten agreement to provide her with a membership interest.  Neither of the parties in their

briefing on this motion evince an understanding that anything other than a written document would entitle Plaintiff to membership in the fund.  Nor is any such understanding shown in the record.  Plaintiff does not rely in her briefing on any oral discussion or conduct that could constitute an agreement on the material terms for her entry as a limited partner into Funds III or IV.  Instead, Plaintiff bases her claim on the assertion that "[u]nder the Employment Agreement, Ms. Rhee was promised admission as a member in the form of carried interest for sourcing PSERS.  Moreover, under the Bonus Letter . . . Santé promised her admission into Fund III albeit at a lower percent of carried interest than she earned under the [E]mployment [A]greement."  Dkt. No. 79 at 16.  Plaintiff thus relies on two written documents to establish her entitlement to fiduciary duties through a membership interest in one of the funds.  Both of these bases for membership interests fail.

Plaintiff's reliance on the Employment Agreement fails for two reasons.  First, the Employment Agreement was never alleged as a basis for fiduciary duties in the TAC, and again, Plaintiff cannot use her opposition brief at summary judgment to amend her complaint.  That is an independent basis for dismissing the claim.  *See Greenidge*, 446 F.3d at 361.  Second, the Employment Agreement only offers carried interest in Fund II.  Dkt. No. 78-2 at ECF p. 1.  Plaintiff's allegations in the TAC are premised entirely upon purported membership in Fund III, Dkt. No. 42 ¶ 14, and it is undisputed that Plaintiff only received a $200,000 discretionary bonus for her assistance for Fund II, and no membership interest in Fund II.  *See* Dkt. No. 79 ¶ 8.  Plaintiff admits, in her response to Defendant's Rule 56.1 Statement, that Santé "didn't close any investors that Rhee had sourced, qualified and helped for Fund II."  *Id*.  Therefore, no fiduciary duties arose as a result of the Employment Agreement because Plaintiff never received membership in Fund II under its provisions.

Plaintiff's second theory that she was owed a fiduciary duty by Defendant based upon the Bonus Letter fares no better.  First, the theory suffers from the fatal flaw that any alleged misconduct implicating the fiduciary relationship predated the establishment of a fiduciary relationship.  As for the misconduct prong, Plaintiff alleges that Defendant "fail[ed] to vest the full amount of carried interest owed to Plaintiff under the Employment Agreement," Dkt. No. 42 ¶ 56, and that it "knowingly and willfully took a substantial portion of the proceeds owed to Plaintiff for their own benefit," *id.* ¶ 58.[11]  Aside from the fact that Defendant owed and paid no carried interest to Plaintiff under the Employment Agreement because the agreement only pertained to Fund II, Defendant's alleged breach of that agreement occurred while she was still only an employee and not yet a fiduciary of Defendant.  As previously noted, an employer does not owe an employee a fiduciary duty.  *See Rather*, 886 N.Y.S.2d at 125.  As for the additional misconduct of taking the "proceeds owed to plaintiff for their own benefit," Dkt. No. 42 ¶ 58, Plaintiff is unclear as to what those proceeds are and from where those obligations arise.  If those proceeds were owed by virtue of the Employment Agreement, there again was no fiduciary relationship at the time of that breach.  If the proceeds were the carried interest owed under the Bonus Offer, then the theory defies logic—no fiduciary relationship was ever established if the misconduct was also the denial of the membership interest necessary to establish that fiduciary relationship.  *See*, *e.g.*, *Coeur, Inc. v. Wygal*, 2021 WL 4225657, at *6 (W.D.N.Y. Sept. 16, 2021) (dismissing breach of fiduciary duty claim because "[a]t the time of the alleged

---

[11] Plaintiff also alleged in the TAC that Defendant "intentionally violat[ed] federal and state securities laws to enrich themselves at the expense of plaintiff," Dkt. No. 42 ¶ 57, but never describes or alleges what federal or state securities laws Defendant violated by payment of a discretionary bonus.  Nor does Plaintiff explain why violation of those laws would also constitute a breach of fiduciary duty owed to Plaintiff.

misconduct," defendant was not in a fiduciary relationship with the plaintiff).  Plaintiff must instead prevail on a theory of breach of contract, not a breach of fiduciary duty.

Plaintiff also cannot establish that she is owed carried interest under the Bonus Letter pursuant to a breach of contract theory.  To be sure, on March 6, 2020, Plaintiff received a letter from Lalande indicating to her that "you will . . . receive a carried interest grant of .50% in SHV Management Services III, LP, the general partner of Santé Health Ventures III, LP ("Fund III")." Dkt. No. 80-2.  But a promise of a bonus is not the same as the bonus itself.  At best, Plaintiff points to the existence of a mere *promise* for a bonus for carried interest, which cannot alone establish a fiduciary relationship.  Even if the Court were to award a remedy for the breach of that promise, it would not award specific performance because Plaintiff never sought specific performance for her breach of contract claim for any carried interest due to her, *see* Dkt. No. 42 ¶ 47, and specific performance in any event would be inappropriate because monetary damages are sufficiently adequate for the value of the membership interest.

Second, such a promise of a bonus is unenforceable because it is undisputed that the bonus was (1) purely discretionary and (2) subject to conditions that were never fulfilled. "[W]here an employee's contract either leaves the bonus in the employer's discretion or conditions it on an event that has not occurred, such as employment through a specific date, courts have decided such questions as a matter of law."  *Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 449 (S.D.N.Y. 2010).  And under New York law, "a corporation proposing to give a sum for the benefit of any person or any set of persons has the right to fix the terms of his bounty, and provide under what circumstances the gift shall become vested and absolute." *Hall v. United Parcel Serv. of Am., Inc.*, 555 N.E.2d 273, 279 (N.Y. 1990) (alternation omitted) (quoting *McNevin v. Solvay Process Co.*, 53 N.Y.S. 98, 99 (4th Dep't 1898), *aff'd*, 60 N.E. 1115

34

(1901)); *cf. Thomson v. Saatchi & Saatchi Holdings (USA), Inc*., 958 F. Supp. 808, 825 (W.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998) ("A promise to pay a bonus is unenforceable, then, if the written terms of the bonus plan make clear that the employer has 'absolute discretion' in deciding whether to grant or pay a bonus.").  In her complaint and in her briefing, Plaintiff has conceded numerous times that this bonus was entirely "discretionary." Dkt. No. 79 at 14; *see also* Dkt. No. 42 ¶¶ 14, 21, 22.  Further, Plaintiff's bonus in the Bonus Letter was qualified by an accompanying agreement, as the letter notes that "[t]he *specific details and vesting schedule* of the carried interest are set forth in the applicable *Transfer and Admission Agreement*."  Dkt. No. 80-2 (emphasis added).  On July 13, 2020, Plaintiff sent an email inquiring about the vesting schedules for Fund III, and Lalande informed her that she "will receive assignment docs and Jason can walk you through them."  Dkt. No. 80-3.  Brandt testified, however, that "[Plaintiff] was not" given the carried interest grant, in part because "it takes some time from a legal perspective to get documents drafted, not just for Julia but for other employees at the time," and that his understanding was that she had resigned before such documents were executed.  Dkt. No. 86-2 at 10.  It is undisputed that the agreement and legal documentation were never signed.  While the parties dispute whether Defendant interfered with the signing of the final agreement and the circumstances of her termination, it is undisputed that she never received her carried interest.  It is thus undisputed that there are no fiduciary duties owed to Plaintiff by Defendant.  For these reasons, Plaintiff has not alleged any theory under which she may enforce the promise for a bonus.

**CONCLUSION**

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 75.


SO ORDERED.


Dated: May 8, 2023
         New York, New York                    _____
                                                         LEWIS J. LIMAN
                                                   United States District Judge