UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _12/26/2023_

------------------------------------------------------------------------X
                                                          :
YOUNGJOO RHEE,                                            :
                                                          :
                              Plaintiff,                  :
                                                          :                    21-cv-4283 (LJL)
                                                          :
        -v-                                               :
                                                          :                    OPINION AND ORDER
SHVMS, LLC, d/b/a SANTÉ VENTURES,                         :
                                                          :
                              Defendant.                  :
                                                          :
------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Defendant SHVMS, LLC, d/b/a Santé Ventures ("Defendant") moves, pursuant to

Federal Rule of Civil Procedure 59(a) for a new trial or remittitur.  Dkt. No. 121.  Plaintiff

Youngjoo Rhee ("Plaintiff") moves, pursuant to Federal Rule of Civil Procedure 59(d), to amend

the judgment to add prejudgment interest.  Dkt. No. 116.  For the following reasons, both

motions are granted in part.

## BACKGROUND

        The Court discusses only the evidence adduced at trial that is relevant to the instant

motions and, in each instance, in the light most favorable to the non-moving party.

        Defendant is a venture capital firm.  Trial Tr. 32:13, 177:18.  It raises capital from

investors, pools it into funds, and then invests it in early-stage bio- and medical-technology

companies.  *Id.* at 178:21–179:3.  Defendant organizes its funds sequentially and names them

accordingly: Fund I, Fund II, Fund III, and Fund IV.  *Id.* at 178:21–24.  Defendant also managed

a hedge fund.  *Id.* at 32:15, 215:6–8.  Kevin Lalande is one of Defendant's founding members

and managing directors.  *Id.* at 155:8–9.

Plaintiff is a former employee of Defendant.  She was hired by Defendant in the fall of 2010 on an at-will basis as its Director of Marketing and Investor Relations.  *Id.* at 32:22–33:6, 162:5.  Her primary job responsibilities included sourcing and qualifying investors for Defendant's funds and assisting with Defendant's fundraising activities.  *Id.* at 35:1–3.  Plaintiff also contributed to Defendant's marketing efforts.  *Id.* at 35:8–9.

The terms of Plaintiff's employment were set forth in an offer letter (the "Offer Letter"), delivered to her by email, on August 18, 2010, prior to her October 1, 2010 start date.  *See* Plaintiff's Ex. 1b.  The Offer Letter has no end date or term.  It provides that Plaintiff will be paid both an "Annual Base Compensation" and "Incentive Compensation."  Plaintiff's Ex. 1a.  Plaintiff's base salary was $130,000 a year.  Trial Tr. 39:15.  With respect to Incentive Compensation, the Offer Letter states:

Venture Capital Fund

- Cash Bonus: 1% of the total amount of capital directly raised, paid in equal quarterly installments over three years.  100% vested upon closing each LP; adjusted appropriately in the case of a defaulting LP.  For example, if you are directly involved in sourcing, qualifying and helping us close $60MM in capital in Fund II, then your incentive compensation would be an additional $600,000 paid quarterly over three years, or $50,000 per quarter.

- Carried Interest: 0.50% of the carried interest in Fund II per $20MM of capital directly raised, up to a maximum of 2.00%.  For example, if you are directly involved in sourcing, qualifying, and helping us close $60MM in capital in a $200MM Fund II that achieves its target of a 3.0x gross return, this would result in pre-tax proceeds to you of approximately $1,750,000.  Your carried interest would be 50% vested upon closing each $20MM grant threshold, with the balance vesting monthly over six years.

- Interest Free Loan: In order to help ease investment cash flow burdens at this early stage of your career, we will extend to you a low interest, non-recourse loan covering the $200,000 in co-investment obligations associated with the carried interest grant above.

Plaintiff's Ex. 1a.  The Offer Letter further provided that Plaintiff would receive "Performance Interest" for all capital that she was "directly involved in sourcing, qualifying and helping . . . close" with respect to Defendant's hedge fund and that she would receive benefits in the form of eligibility for Defendant's 401(k) plan, health insurance premium coverage, and three weeks of leave.[1]  *Id.*

When Plaintiff joined Defendant, Defendant was in the process of raising funds for Fund II.  Tr. 162:10–163:12.  To assist, Plaintiff contacted a large number of prospective investors, including by emailing several hundred contacts.  *Id.*  She also organized dozens of meetings for her and Lalande to speak with potential investors.  *Id.* at 164:16–165:3.  Yet her efforts with respect to Fund II were unsuccessful, as they did not result in any investments.  *Id.* at 166:3–5, 187:11–16.  Notwithstanding her failure to raise any funds for Fund II, Defendant believed Plaintiff had built important relationships for the future, so Defendant paid her a $200,000 bonus.  *Id.* at 40:1–3, 167:2–6, 187:18–21.

Fund II closed in the fall of 2011.  *Id.* at 86:4–6.  Defendant did not attempt to raise another fund until the summer of 2017.  *Id.* at 187:9–10.  While Defendant was not actively raising additional funds, Plaintiff performed research and provided operational support for Defendant.  *Id.* at 35:16–23.

Defendant began raising funds for Fund III in July 2017, *id.* at 187:9–10, and Plaintiff once again assisted with fundraising and marketing, *id.* at 187:11–14.  Her initial efforts did not yield investments.  *Id.* at 185:15–16.  However, she ultimately helped secure a single investment,

---

[1] Defendant adduced testimony at trial that Plaintiff's employment agreement was modified with her consent in 2011 to render her bonuses wholly within Defendant's discretion.  *E.g.*, Trial Tr. 182:20–184:16.  Plaintiff denied that there was any such modification.  *Id.* at 39:5–13.  The Jury rejected Defendant's modification defense in the verdict, Dkt. No. 111 at 2, and Defendant does not reprise that defense at this stage.

but it was a large one from an important investor: the Pennsylvania Public School Employees'
Retirement System ("PSERS").  *Id.* at 37:5–6.  Plaintiff had initiated contact with PSERS in
2011.  *Id.* at 49:16–17.  On July 19, 2011, Plaintiff sent an email to an investment analyst at
PSERS, Luke Jacobs, asking whether Jacobs had received Defendant's white paper and
requesting his feedback.  Plaintiff's Ex. 11.  Jacobs responded the following day that he would
look at the white paper, but the conversations between Plaintiff and Jacobs ended there.  *Id.*  As a
result, PSERS did not invest in Fund II.  Trial Tr. 37:7–8.  Although Plaintiff contacted PSERS
again in October 2017, she did not receive a response.  *Id.* at 50:23–25.  On July 26, 2018,
however, a senior investment professional at PSERS, Patrick Knapp, sent an unsolicited email to
Plaintiff introducing himself as the person who ran "point" at PSERS on new general partner
relationships.  Plaintiff's Ex. 12.  Knapp stated that he had come across Plaintiff's
correspondence with Jacobs and asked to set up a call.  *Id.*  Plaintiff agreed, spoke with Knapp,
and put him in touch with Lalande.  Trial Tr. 198:4–5.

Over the next nine months, PSERS personnel repeatedly met with the investment
professionals at Defendant and conducted operational and legal due diligence.  *Id.* at 198:8–15.
Lalande personally had "dozens of meetings" with Knapp and his team.  *Id.* at 198:9–10.  The
main points of contact for PSERS with Defendant were Lalande, Defendant's Chief Operating
Officer David Kaufman, and its Chief Financial Officer Jason Brandt.  *Id.* at 198:21–25.  While
Plaintiff had "handed [PSERS] off" to other members of Defendant's team, *id.* at 222:4, she
neither refused to perform services when asked nor failed to attend meetings when invited, *id.* at
223:6–224:1, 241:20–242:3.

The relationship between Defendant and PSERS proved fruitful.  On December 19, 2018,
PSERS's investment advisors issued a letter recommending that PSERS commit up to $150

million into funds managed by Defendant, "split up to $75 million to Santé Health Ventures III, LP and $75 million to Santé Health Ventures IV, LP."  Plaintiff's Ex. 9 at 8.  The investment advisors' recommendation was incorporated into a Public Investment Memorandum (the "Investment Memo"), prepared by Knapp and also dated December 19, 2018, that stated:  "Staff, together with Hamilton Lane Advisors, L.L.C, . . . recommends to the Board a commitment of up to $75 million to Santé Health Ventures III, L.P. . . . and up to $75 million to Santé Health Ventures IV, L.P."  *Id.* at 2.  In April 2019, PSERS executed a subscription agreement and committed $75 million to Fund III.  Trial Tr. 129:7–8.

After PSERS invested in Fund III, Plaintiff spoke to Lalande about her cash bonus from their substantial commitment.  Lalande assured her that she would receive a bonus, but they did not discuss the specific amount.  *Id.* at 199:17–200:9.  On December 16, 2019, Plaintiff messaged Brandt via Slack:  "Is there a reason why my incentives from PSER has not started for fund III portion?  The 1% from PSER's commitment should have been paid out quarterly and expected to have this started as soon as we closed but wondering if there is any admin reasons. (although I have side discussions with Kevin on my evolving role..etc it only started recently)." Plaintiff's Ex. 6.  Brandt replied:  "Hi Julia - we are going through the budget planning process for 2020 and reviewing everything, including some of the additional requests you discussed with Kevin when you were here.  We should have everything wrapped up by the end of the year."  *Id.*

On February 28, 2020, Plaintiff wrote Brandt again, this time copying Lalande:  "I am following up from two weeks ago regarding current & backed-up cash commissions which were due upon the closing of the fund III and the partial IV.  On December 16th, you mentioned this would be resolved by year-end.  It is now almost March and there is still no clarity on the situation.  I have significant concerns with concerns over compliance, IRS matters which can

escalate quickly and detail.  We need to have a resolution immediately, and I will make myself available on Monday to discuss this matter.  I am copying Kevin so we are all on the same page given the gravity and urgency of the situation."  Plaintiff's Ex. 7.  Brandt responded:  "There are no compliance or IRS matters associated with your commissions/bonus.  The commissions/bonus will have the appropriate taxes deducted upon payment.  I will give you a call on Monday to discuss this."  *Id.*  Brandt and Plaintiff discussed her entitlement to the cash bonus on a phone call a two days later.  *Id.* at 90:20–91:3, 136:20–137:6.

On March 6, 2020, Lalande sent a letter to Plaintiff on Defendant's behalf, awarding her a bonus.  Plaintiff's Ex. 3.  The letter thanked Plaintiff for her service as Director of Marketing and Investor Relations and stated that, in recognition of her contribution, she was being given a cash bonus of $300,000 to be paid on March 13.  *Id.*  The letter also stated that Plaintiff would receive a carried interest grant of 0.50% in the general partner of Fund III.  *Id.*  Based on her prior communications with Brandt, Plaintiff was expecting the bonus and understood it to be a lump-sum, catch-up payment of the cash bonus she had been seeking.  Trial Tr. 62:8–10.  Lalande also understood that the $300,000 bonus was meant to compensate Plaintiff for her work with PSERS.  *Id.* at 175:5–9.

On July 13, 2020, Plaintiff emailed Lalande requesting clarification about her payout schedule for her bonus from the PSERS investment, indicating that she had not yet received a second quarter payout for 2020.  Plaintiff's Ex. 4 at 1.  Lalande replied that the $300,000 bonus had fully compensated Plaintiff for "the value of PSERS" with respect to Fund III.  *Id.* at 1–2.  He also asked whether her inquiry was based on the 2010 Offer Letter.  *Id.* at 1.  Plaintiff replied: "Yes.  I was referring to them from the 2010 agreement."  *Id.*  She quoted the Offer Letter's

bonus provision and wrote:  "We did not agree or sign a new agreement adjusting or lower/raising the fee."  *Id.*  Lalande did not respond to Plaintiff's email.  Trial Tr. 77:24–25.

Plaintiff's employment with Defendant ended shortly thereafter.  In July of 2020, Lalande received an email from an investor who accused Plaintiff of defrauding him and his wife in connection with a start-up company Plaintiff had formed.  *Id.* at 201:16–21.  A few days later, Lalande and Plaintiff had a conversation to discuss the accusation.  *Id.* at 201:9–13.  Although Lalande and Plaintiff dispute the contents of that conversation—specifically, whether Plaintiff resigned or was terminated—the parties agree that her employment ended at that time.  *Id.* at 113:12–13, 203:5–20.  Plaintiff subsequently contacted Defendant through counsel to demand a bonus reflecting PSERS's full investment.  *Id.* at 204:8–10.

In November 2020, after Plaintiff's departure, Defendant and PSERS discussed a potential investment in Fund IV.  *Id.* at 235:3–5.  Those conversations materialized in April or May of 2021, when PSERS invested $75 million into Fund IV.  *Id.* at 129:8, 234:20.

## PROCEDURAL HISTORY

Plaintiff commenced this suit by filing the complaint on May 12, 2021.[2]  She filed an amended complaint on July 23, 2021, Dkt. No. 13, a second amended complaint on September 3, 2021, Dkt. No. 23, and—with leave of the Court, Dkt. No. 34—a third amended complaint on December 10, 2021, Dkt. No. 42.

Defendant moved to dismiss the third amended complaint on December 23, 2021 for failure to state a claim.  Dkt. No. 45.  On February 28, 2022 the Court granted Defendant's motion in part and dismissed Plaintiff's fraud, contractual attorney's fees, and equitable estoppel

---

[2] Plaintiff attempted to file the complaint on May 12, 2021.  Dkt. No. 1.  It was rejected due to a filing error.  The complaint was accepted for filing on May 19, 2021.  Dkt. No. 4.

claims. Dkt. No. 56 at 8–11. However, the Court denied Defendant's motion as to Plaintiff's breach of contract, unjust enrichment, and breach of fiduciary duty claims. *Id.* at 5–6, 8.

After the close of discovery, Defendant filed a motion for summary judgment on Plaintiff's remaining claims. Dkt. 75. The Court granted that motion as to Plaintiff's unjust enrichment and breach of fiduciary duty claims, but denied summary judgment on her breach of contract claim. Dkt. No. 91.

Plaintiff therefore proceeded to trial before a Jury on September 19, 2023. On September 22, 2023, the Jury returned a verdict. Dkt. No. 111. The Jury found that Plaintiff had proven that Defendant's failure to pay her a cash bonus violated the terms of the Offer Letter and that Defendant had not established the affirmative defense of contract modification. *Id.* at 1–2. The Jury awarded Plaintiff $1,500,000 in compensatory damages for that breach. *Id.* at 3. But the Jury returned a verdict in favor of Defendant on Plaintiff's claim that Defendant also breached the Offer Letter by failing to award her carried interest in Fund III and Fund IV. *Id.* at 1. In accordance with the verdict, the Court entered judgment in Plaintiff's favor in the amount of $1,500,000 on October 2, 2023. Dkt. No. 113.

Four days later, Plaintiff moved to amend the judgment to add prejudgment interest. Dkt. No. 116. Defendant responded in opposition to that motion on October 20, 2023, Dkt. Nos. 117–18, and Plaintiff filed a reply brief on October 27, 2023. Dkt. No. 123.

On October 27, 2023, Defendant filed its motion for a new trial or remittitur as well as a supporting affirmation. Dkt. Nos. 121–22. Plaintiff filed a response opposing the motion on November 10, 2023. Dkt. No. 124. On November 17, 2023, Defendant filed a reply. Dkt. No. 125.

The Court heard oral argument on those motions on December 21, 2023.

## LEGAL STANDARD

A court can grant a motion for a new trial under Federal Rule of Civil Procedure 59 "if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012). "A verdict [is] against the weight of the evidence if the jury reached a 'seriously erroneous result' or the verdict constitutes 'a miscarriage of justice.'" *Hughes v. Town of Bethlehem*, 644 F. App'x 49, 50 (2d Cir. 2016) (summary order) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002) (per curiam)); *see also Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003). In resolving a motion for a new trial, "the court 'may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.'" *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (quoting *Raedle*, 670 F.3d at 418). But a "high degree of deference accorded to the jury's evaluation of witness credibility, and . . . jury verdicts should be disturbed with great infrequency." *Raedle*, 670 F.3d at 418.

A trial judge's discretion to grant a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)). "Remittitur is appropriate in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a

particular, quantifiable error.'" *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (quoting *Kirsch*, 148 F.3d at 165).

## DISCUSSION

### I.    Defendant's Motion for a New Trial or Remittitur

Defendant argues that the Court should grant a new trial on damages or remittitur because the Jury's award was "excessive and contrary to evidence."  Dkt. No. 121 at 1.  While Defendant concedes that Plaintiff's Fund III bonus vested during her employment, Defendant avers that the $300,000 payment she received fully compensated her for the payment that she was due while she was employed, on the theory that she is not entitled to payment installments that became due after her termination.  *Id.*  Additionally, Defendant contends that the Jury erred in awarding Plaintiff her Fund IV bonus, as that bonus did not vest until after her termination.  *Id.* at 2. Plaintiff responds that her Fund III and Fund IV bonuses vested simultaneously when PSERS issued the Investment Memo.  Dkt. No. 124 at 2.  She further asserts that the $300,000 payment she received was not "part of the cash bonus payment" for PSERS's investment.  *Id.*  And she argues that Defendant cannot withhold her earned but not yet paid bonuses "regardless of her employment status."  *Id.* at 8.

"[U]nder New York law . . . '[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.'"  *O'Dell v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378, 397 (S.D.N.Y.2001) (quoting *Hall v. United Parcel Serv. of Am., Inc*, 555 N.E.2d 273, 279 (N.Y. 1990)); *see also Iqbal v. Teva Pharms. USA, Inc.*, 2017 WL 6729190, at *5 (S.D.N.Y. Dec. 28, 2017) ("[E]ntitlement to a bonus exists only when the terms of the relevant contract require it."), *aff'd*, 753 F. App'x 50 (2d Cir. 2018); *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*, 2010 WL 4058143, at *5 (S.D.N.Y. Sept. 30, 2010) (Sullivan, J.) ("[A]n employer and employee can agree about the point in time when a [bonus] becomes 'earned.'" (citation omitted)).  Just as with

10

respect to wages, once an employee earns a bonus under her contract, "it cannot be forfeited." *Arbeeny v. Kennedy Exec. Search, Inc.*, 893 N.Y.S.2d 39, 42 (1st Dep't 2010).  As a result, "when an employee has already earned compensation under the terms of his employment contract, his termination does not affect his rights to that compensation."  *Barker v. Bancorp, Inc.*, 2022 WL 595954, at *7 (S.D.N.Y. Feb. 25, 2022) (quoting *Iqbal*, 2017 WL 6729190, at *5); *Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 448 (S.D.N.Y. 2010).

Thus, the Court must examine Plaintiff's Offer Letter to ascertain when—if ever—she earned bonuses from PSERS's investments in Fund III and Fund IV.  "If the language of the contract is 'unambiguous and conveys a definite meaning,' then the interpretation of the contract is a question of law for the court."  *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir. 1995) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)); *see also Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 41 (2d Cir. 2019).  "Alternatively, '[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another,' then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible."  *Bourne*, 68 F.3d at 629 (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)); *see also Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 804 (2d Cir. 2023).

Here, the Offer Letter unambiguously entitled Plaintiff to a cash bonus of "1.00% of the total amount of capital directly raised, paid in equal quarterly installments over three years" that "100% vested upon closing each LP."  Plaintiff's Ex. 1a.  Plaintiff therefore earned an unqualified right to her cash bonus when an investor, *i.e.*, a limited partner or "LP", closed its investment in one of Defendant's funds.  *See Vested*, Black's Law Dictionary (11th ed. 2019)

("Having become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute."); *Vested*, Merriam-Webster (2023), https://www.merriam-webster.com/dictionary/vested ("[F]ully and unconditionally guaranteed as a legal right, benefit, or privilege."); *see also Hall*, 555 N.E.2d at 279 ("At common law, 'a corporation proposing to give a sum for the benefit of any person or any set of persons has the right to fix the terms of his bounty, and provide under what circumstances the gift shall become *vested and absolute*.'" (emphasis added) (quotation omitted)).  As a matter of plain meaning, closing requires a formal, binding commitment.  *See In re Adelphia Commc'ns Corp.*, 287 B.R. 605, 616 n.24 (Bankr. S.D.N.Y. 2003) (explaining the "common meaning" of "close" is "'[t]o consummate a sale or agreement'" (quoting *Close*, Dictionary of Finance and Investment Terms (6th ed.))); *Cohen v. J.P. Morgan Chase & Co.*, 608 F. Supp. 2d 330, 345 (E.D.N.Y. 2009); *Closing*, Black's Law Dictionary (11th ed. 2019) ("The consummation of a deal or transaction, usually by signing binding documents concurrently with the exchange of money.").  Thus, Plaintiff earned her bonus under the Offer Letter when an investor formally consummated its investment in one of Defendant's funds,[3] though payments of that bonus would be made in equal installments each quarter over the next three years.

Although Plaintiff argues that her bonuses from PSERS's investments in Funds III and IV both vested when Knapp issued the Investment Memo on December 19, 2018, Dkt. No. 124 at 2, the evidence at trial refutes her assertion.  The Investment Memo itself explicitly

---

[3] To be eligible for a cash bonus from a particular client's investment, Plaintiff had to be "directly involved in sourcing, qualifying, and helping [Defendant] close" that investment. Plaintiff's Ex. 1a.  But Defendant's motion does not challenge Plaintiff's eligibility for bonuses in connection with PSERS's investments in Funds III and IV on the grounds that she was not directly involved in those three tasks.  Thus, the Court does not address whether Plaintiff sourced, qualified, and helped Defendant close PSERS's investments.

"recommends" an investment with Defendant "to the Board" of PSERS. Plaintiff's Ex. 9 at 1.
As Lalande explained without contradiction: "This is not a legally binding document. In order
to invest in – to be legally bound to invest in a fund, an investor or a limited partner needs to sign
a limited-partner agreement which are extensive, multi-hundred-page documents laying out all
the terms and conditions in the investment of the fund." Trial Tr. 205:7–11; *see also id.* at
235:6–9. Even Plaintiff testified that the Investment Memo did not bind PSERS to invest with
Defendant and that PSERS in fact closed its limited partnership interests in Funds III and IV at a
later time. *Id.* at 88:10–89:14. Accordingly, Plaintiff did not earn her bonuses upon publication
of the December 19, 2018 Investment Memo.

Plaintiff's bonus from Fund III instead vested in April of 2019, when PSERS executed a
subscription agreement and formally invested $75 million in that fund. Trial Tr. 129:7–8. As a
result, Defendant owed Plaintiff a cash bonus of 1% of the capital raised—*i.e.*, $750,000—to be
paid in quarterly installments of $62,500 over the next three years. *See* Plaintiff's Ex. 1a.
Defendant concedes that "[f]or her efforts in helping to secure PSERS's investment in Fund III,
Plaintiff's cash bonus was $750,000.00, to be paid in quarterly installments over 3 years." Dkt.
No. 121 at 7. But Defendant asserts that only four of those quarterly installments had become
due prior to the end of Plaintiff's employment in July of 2020. *Id.* According to Defendant,
Plaintiff's departure rendered her ineligible for subsequent installments, so she was entitled to "a
total of $250,000 in cash bonus (4 quarterly payments of $62,500.00) for her efforts in helping to
secure PSERS's investment in Fund III." *Id.* at 8. Defendant's reasoning is erroneous. Pursuant
to the terms of the Offer Letter, "100%" of Plaintiff's bonus for her work with respect to
PSERS's investment in Fund III became "vested" upon the closing of that investment in April
2019. At that point, she earned the right to 100% of the bonus, to be paid out over a period of

time.  Defendant would not have had the ability to deprive her of a portion of the bonus by the expedient of terminating her employment before a payment became due.  Nor was she required to continue to work for Defendant lest if she failed to do so she would lose the right to that continuing stream of payments.  Because Plaintiff's bonus fully vested upon PSERS's April 2019 investment in Fund III, she earned an unqualified right to the $750,000 bonus at that time— to be paid in intervals into the future.  Despite her subsequent termination, Plaintiff remained entitled to the bonus she had "earned prior to the termination of her employment."  *Devany v. Brockway Dev., LLC*, 900 N.Y.S.2d 329, 331 (2d Dep't 2010); *see Compagnia Importazioni Esportazioni Rappresentanze v. L-3 Commc'ns Corp.*, 703 F. Supp. 2d 296, 308 (S.D.N.Y. 2010) ("[I]f the triggering event for the earning of commissions has occurred prior to termination, the commissions are payable after termination."); *Simas v. Merrill Corp.*, 2004 WL 213013, at *3 (S.D.N.Y. Feb. 4, 2004) (same).

The parties would have been free, of course, to draft the Offer Letter such that Plaintiff's bonus would vest gradually with each installment payment.  *See Pachter v. Bernard Hodes Grp., Inc.*, 891 N.E.2d 279, 284 (N.Y. 2008) (explaining "it is well settled that parties to a transaction are free to . . . enter[] into a different arrangement" governing when a bonus will "be deemed 'earned' or vested"); *see also Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at *2 (S.D.N.Y. Aug. 21, 2018) (interpreting an agreement under which compensation vested gradually).  However, they did not do so here.  *See Arbeeny*, 893 N.Y.S.2d at 42.  Instead, the parties agreed that her bonus would become "100% vested upon closing each LP."  Plaintiff's Ex. 1a.  That language controls.  *See Hall*, 555 N.E.2d at 279.  The Court will not "under the guise of contract interpretation, imply a term which the parties themselves failed to insert or otherwise rewrite" the Offer Letter's unambiguous vesting provision.  *City of New York v.*

14

*Quadrozzi*, 134 N.Y.S.3d 798, 799 (2d Dep't 2020) (cleaned up).  Plaintiff therefore became

legally entitled to a $750,000 bonus, to be paid out in quarterly installments over the next three

years, once PSERS invested in Fund III in April of 2019, notwithstanding her termination in July

of 2020.

But the overwhelming weight of evidence at trial establishes that Defendant provided

Plaintiff $300,000 of her bonus for PSERS's investment in Fund III on March 13, 2020.[4]  The

bonus immediately followed Plaintiff's demand that Defendant honor its commitment to pay her

a 1% bonus for the PSERS investment and her complaint that she had not been paid the initial

installments of that bonus after the closing of Fund III.  *See* Plaintiff's Exs. 6–7.  Although

Lalande's March 6, 2020 bonus letter did not specifically mentions PSERS, Lalande testified that

the $300,000 bonus was meant to compensate Plaintiff for bringing in PSERS.  Trial Tr. 175:5–

9.  The bonus letter also referenced the 0.50% carried interest grant in the general partner of

Fund III, mirroring the terms of the Offer Letter.  Plaintiff's Ex. 3.  Plaintiff similarly testified

that she understood that the $300,000 was a "catch-up" payment of the bonus from her work on

PSERS that Plaintiff had discussed with Brandt.  Trial Tr. 62:10; *see also* Plaintiff's Exs. 6–7.

In her post-trial briefing, Plaintiff attempts to qualify that statement, asserting that "she initially

thought the payment was a catch-up for the amounts owed under her Employment Agreement,

but later was disavowed [sic] of that notion when Mr. Lalande repudiated the contract."  Dkt. No.

---

[4] At oral argument, Plaintiff asserted for the first time that Defendant cannot argue that the
$300,000 payment was part of her bonus for PSERS's investment in Fund III because Defendant
failed to plead the affirmative defense of setoff.  "[T]his argument was raised for the first time at
oral argument and so was waived in terms of this motion."  *Wade Park Land Holdings, LLC v.
Kalikow*, 589 F. Supp. 3d 335, 369 (S.D.N.Y. 2022) (quotation omitted).  In any event, the
doctrine of setoff permits parties to apply "their mutual debts against each other."  *Westinghouse
Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002) (quotation omitted).  As Plaintiff did
not incur a debt to Defendant when she received the $300,000, the doctrine of setoff is
inapplicable to that payment.

124 at 2.  Yet the sole evidence Plaintiff cites in support of that proposition is a July 2020 email

from Lalande to Plaintiff that *corroborates* their testimony that Defendant paid Plaintiff the

$300,000 as a bonus for securing PSERS's investment in Fund III, as Lalande wrote that the

$300,000 bonus was made "in recognition of the value of PSERS."  Plaintiff's Ex. 4.

Furthermore, Plaintiff's current assertion contradicts her position at trial.  In her opening

statement, Plaintiff argued that Defendant "paid her $300,000 for finding [PSERS.]"  Trial Tr.

22:19–22.  Her summation was even more explicit:

> Let's talk about damages.  The damages are 1 percent of 150 would be $1,500,000
> for a cash bonus.  Now, she got 300,000.  That 300,000 she was told was a catch
> up.  Nothing when she got it was sent to her saying that the old contract had been
> canceled.  So the cash should be $1,200,000.  This is very definite.

*Id.* at 319:24–320:4.  Thus, Plaintiff received $300,000 of the $750,000 bonus Defendant owed

her for PSERS's investment in Fund III, so Plaintiff is now entitled only to the $450,000 of her

bonus that remains unpaid.  *See Fisher v. Textron Am., Inc.*, 158 N.Y.S.2d 974, 975 (App. Term

1956) (per curiam) ("In view of the fact that the defendant paid plaintiff only $7,500, in face of

an agreement which called for a $10,000 [bonus] payment, it owed the plaintiff $2,500.").

 Finally, Plaintiff cannot recover an additional $750,000 bonus from PSERS's investment

in Fund IV because her right to that bonus never vested.  Plaintiff's employment with Defendant

was at will.  Trial Tr. 162:5.  Accordingly, the employment relationship could be "freely

terminated by either party at any time for any reason or even for no reason."  *Sullivan v.*

*Harnisch*, 915 N.Y.S.2d 514, 518 (2d Dep't 2010), *aff'd*, 969 N.E.2d 758 (N.Y. 2012).  The

"axiomatic" flexibility of at-will employment also has an important corollary for compensation.

*Id.*  Without a guaranteed term of employment, "there simply can be no certainty as to whether [a

terminated at-will employee] would have remained employed . . . long enough for [deferred

compensation] to vest."  *Kinsey v. Cendant Corp.*, 521 F. Supp. 2d 292, 308 (S.D.N.Y. 2007);

*see Ott v. Fred Alger Mgmt., Inc.*, 2012 WL 4767200, at *8 (S.D.N.Y. Sept. 27, 2012).  Thus, unless the parties agree otherwise, an at-will employee cannot recover bonuses that vest after her termination.[5]  *See Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 289 (S.D.N.Y. 2016) ("[I]t is a well-settled principle of New York law that an at-will employee will be entitled to post-discharge commissions only if the employment agreement expressly provides for such compensation." (quoting *Bravia Capital Partners, Inc. v. Fike*, 2011 WL 6081345, at *3 (S.D.N.Y. Dec. 6, 2011))); *Holahan v. 488 Performance Grp., Inc.*, 33 N.Y.S.3d 214, 216 (1st Dep't 2016); *Arbeeny*, 893 N.Y.S.2d at 42; *Gordon v. Wilson*, 68 A.D.3d 1058, 1060 (2d Dep't 2009); *Mackie v. La Salle Indus., Inc.*, 460 N.Y.S.2d 313, 315 (1st Dep't 1983); *see also Lam v. Am. Exp. Co.*, 265 F. Supp. 2d 225, 236 (S.D.N.Y. 2003).  By contrast, if an at-will employee's right to a bonus vests prior to termination, her entitlement is certain and unqualified, so the employer must pay that bonus even after the employment relationship has ended.  *See Rubin v. Dairymen's League Co-op. Ass'n*, 29 N.E.2d 458, 460 (N.Y. 1940); *Barker*, 2022 WL 595954, at *7; *Compagnia Importazioni Esportazioni Rappresentanze*, 703 F. Supp. 2d at 308; *Simas*, 2004 WL 213013, at *4 ("Resolution of plaintiff's claim for post resignation commissions turns on when, under his contract, commissions are first earned."); *Devany*, 900 N.Y.S.2d at 331 ("[T]he

---

[5] When interpreting ambiguous employment agreements, some courts have concluded that the parties departed from this default rule based on the doctrine of *contra proferentem, i.e.*, that ambiguities in a contract should be construed against the drafter.  *See Yudell v. Ann Israel & Assocs., Inc.*, 669 N.Y.S.2d 580, 581 (1st Dep't 1998); *Kadish v. Gootkin*, 2005 WL 3418133, at *1 (N.Y. App. Term 2005) (per curiam); *Firtell v. Update, Inc.*, 2007 WL 2756965, at *2 (N.Y. Sup. Ct. 2007); *see also Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 431 (S.D.N.Y. 2013).  But the Court need not apply this "rule of, if not last, very late resort" here, *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 712 (2d Cir. 2004), given the Offer Letter's unambiguous vesting clause, *see Churchill Real Est. Holdings LLC v. CBCS Washington St. LP*, 95 N.Y.S.3d 526, 526 (1st Dep't 2019) ("[T]he doctrine of *contra proferentem* is inapplicable here, because the language of the agreement is unambiguous.").

plaintiff was entitled to be paid any commissions earned prior to the termination of her employment.").

The Offer Letter provided that Plaintiff's bonus vested only when an investor became bound to contribute capital to one of Defendant's funds.  Plaintiff's Ex. 1a; *see Allison v. Fundamental Brokers, Inc.*, 1991 WL 51081, at *4 (S.D.N.Y. Apr. 3, 1991) ("A right cannot, however, vest in the abstract; it must vest as a result of or pursuant to some contractual relationship.").  It was at that point that Plaintiff would have earned the bonus.  But when her employment ended in July of 2020, PSERS was not obligated to invest in Fund IV.  Rather, PSERS closed its $75-million investment in Fund IV in April or May of 2021, Trial Tr. at 129:8, 234:20—months after Plaintiff's termination in the summer of the prior year, *id.* at 113:12–13, 203:5–20.  In the words of the Offer Letter, the LP had not "closed."  It follows that, at the time of Plaintiff's termination, she had earned no right to a bonus with respect to a prospective investment by PSERS in Fund IV.  Defendant therefore did not breach a contract by failing to pay her a bonus with respect to Fund IV that—at the time the parties ceased to owe contractual obligations to one another—the contract gave her no right to receive.  *See Butvin v. DoubleClick, Inc.*, 2001 WL 228121, at *9 (S.D.N.Y. Mar. 7, 2001) ("[Plaintiff] had no ownership interest in stock options before they vested; when [defendant] fired [plaintiff] before all his stock options vested he might feel ill-used but he cannot argue that he had been deprived of anything to which he was entitled."), *aff'd*, 22 F. App'x 57 (2d Cir. 2001); *Moore-Haarr v. Z-Axis, Inc.*, 41 N.Y.S.3d 822, 823–24 (4th Dep't 2016) (dismissing a breach of contract claim by a terminated at-will employee because "there [was] no support in the record for plaintiff's claim that she earned the commissions in question before her termination").

In sum, the Jury committed two quantifiable errors in awarding Plaintiff $1.5 million in compensatory damages for her breach of contract claim for unpaid bonuses:  First, the Jury failed to deduct the $300,000 payment Defendant made to compensate Plaintiff for securing PSERS's Fund III investment from the $750,000 bonus Defendant owed her for that contribution.  Second, the Jury improperly awarded Plaintiff a $750,000 bonus for PSERS's investment in Fund IV, even though Plaintiff did not earn a vested right to that bonus.  Those errors "caused the jury to include in the verdict a quantifiable amount that should be stricken."  *Torres v. Metro-N. R.R. Co.*, 2023 WL 4487726, at *12 (S.D.N.Y. July 12, 2023) (quoting *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)).  Accordingly, the Court remits the damages award to $450,000.  "If Plaintiff chooses to reject the remittitur, Plaintiff is entitled to a new trial on the issue of damages."  *Id.* at *14.

## II.  Plaintiff's Motion for Prejudgment Interest

Plaintiff also requests that her award include prejudgment interest.  Dkt. No. 116. Defendant opposes her request on both procedural and substantive grounds.  Dkt. No. 117.

Procedurally, Defendant contends that the Court should deny Plaintiff's motion due to her failure to file a notice of motion and memorandum of law in accordance with Local Rule 7.1(a).  *Id.* at 2.  Under Local Rule 7.1(a), a motion must include a notice of motion specifying the applicable rules and statute pursuant to which the motion is brought as well as the relief sought, and a memorandum of law with relevant cases and authorities.  L.R. 7.1(a)(1)–(2).  "A moving party's failure to comply with Local Rule 7.1 is sufficient grounds to deny a motion." *Anora v. Oasis Pro. Mgmt. Grp., Ltd.*, 2023 WL 2307180, at *2 (S.D.N.Y. Mar. 1, 2023) (quoting *Anhui Konka Green Lighting Co., LTD. v. Green Logic LED Elec. Supply, Inc.*, 2021 WL 621205, at *1 (S.D.N.Y. Feb. 17, 2021)).  However, "the Court has discretion to overlook a failure to comply with Local Civil Rule 7.1."  *Castillo v. Snedeker*, 2023 WL 7625882, at *1 n.2

(S.D.N.Y. Nov. 9, 2023); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."). Courts have exercised that discretion to overlook violations of "Local Rule 7.1(a)(1), reasoning that 'it would serve the interests of justice to resolve the motion . . . on the merits rather than on procedural deficiencies.'" *Anhui Konka Green Lighting Co.*, 2021 WL 621205, at *1 (quoting *Assets Recovery 23, LLC v. Gasper*, 2017 WL 3610568, at *4, *8 (E.D.N.Y. July 25, 2017)). But in doing so, courts have confirmed that the movants' submissions ensure that "the parties are 'fairly and adequately apprised of the nature and basis of the application.'" *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 155 (E.D.N.Y. 2016) (quoting *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 2013 WL 5725987, at *2 (E.D.N.Y. Oct. 21, 2013)); *see also Anora*, 2023 WL 2307180, at *2. Despite its technical deficiencies, Plaintiff's motion for prejudgment interest adequately apprised Defendants of the "applicable rules or statutes pursuant to which the motion is brought," "the relief sought by the motion," and "the cases and other authorities relied upon in support of the motion." L.R. 7.1(a). Plaintiff explicitly moves "pursuant to Federal Rule of Civil Procedure 59(d)," for "an amendment to the Judgment to include pre-judgment interest." Dkt. No. 116 at 1. She further cites New York's prejudgment interest statute and relevant case law. *Id.* at 1–2. And she puts forward calculations that support the amount of prejudgment interest she has requested. *Id.* at 2. "Thus, the Court will not dismiss Plaintiff's motion for failing to comply with Local Rule 7.1." *Anhui Konka Green Lighting Co.*, 2021 WL 621205, at *3.

"[I]n an action at law for breach of contract under New York law, 'prejudgment interest is recoverable as of right.'" *TNR Logistics Co. v. Status Logistics Corp.*, 2018 WL 4062633, at *4 (E.D.N.Y. Aug. 27, 2018) (quoting *Trademark Rsch. Corp.*, 995 F.2d at 342); *see* N.Y.

C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract."). By statute, the "[i]nterest shall be at the rate of nine per centum per annum." N.Y. C.P.L.R. § 5004(a). Interest generally begins to accrue from "the earliest ascertainable date the cause of action existed." *Id.* § 5001(b). Where, as here, the jury is discharged without specifying the date from which interest runs, "the court upon motion shall fix the date." *Id.* § 5001(c). "Courts have 'wide discretion in determining a reasonable date from which to award pre-judgment interest, and interest is calculated using the simple . . . [rather than] a compounded rate.'" *Kuan v. Notoriety Grp. LLC*, 2023 WL 3937317, at *11 (S.D.N.Y. May 22, 2023) (quoting *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 49 (E.D.N.Y. 2015)), *report and recommendation adopted*, 2023 WL 3936749 (S.D.N.Y. June 9, 2023).

Plaintiff is entitled to prejudgment interest on her contractual damages. *See* N.Y. C.P.L.R. § 5004(a). But the date from which she urges the Court to apply interest—March 31, 2019, three months after PSERS issued the non-binding Investment Memo—is incorrect. Dkt. No. 116 at 2. As explained above, Plaintiff's cash bonus from PSERS's investment in Fund III vested in April of 2019, such that Defendant owed Plaintiff her first $62,500 installment payment in July of 2019. Because Defendant failed to provide an installment payment at that time, the Court deems July 31, 2019 to be the earliest ascertainable date on which Plaintiff's cause of action for breach of contract existed.[6]

Yet that date is not controlling here. Defendant correctly observes that Plaintiff's damages accrued quarterly, increasing with each bonus installment that Defendant failed to pay. Dkt. No. 117 at 4. And New York law provides that when "damages were incurred at various

---

[6] In light of the Court's wide discretion in setting a date from which prejudgment interest runs, the Court treats a payment on the last day of the relevant month as a timely quarterly payment under the Offer Letter's cash bonus provision. *See* Plaintiff's Ex. 1a.

times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." N.Y. C.P.L.R. § 5001(b); *see N.W. Corp. v. Vulcan Cap. Mgmt., Inc.*, 2008 WL 11516925, at *2 (S.D.N.Y. Oct. 7, 2008). Prejudgment interest therefore began to run on the quarterly installments of Plaintiff's bonus as they became due and unpaid.

Additionally, prejudgment interest is available only on damages ultimately "*awarded* because of a breach of performance of a contract," N.Y. C.P.L.R. § 5001(a) (emphasis added), so the Court's interest calculation must reflect the $300,000 payment on March 13, 2020 that reduced Plaintiff's damages. Plaintiff testified that she understood that amount to be a "catch-up" payment for the installments Defendant owed her at the time. Trial Tr. 62:10. Consequently, the Court concludes that $250,000 of the March 13, 2020 payment provided Plaintiff the first four installment payments of $62,500—which became due on April 30, July 30, and October 31 of 2019 and January 31 of 2020, respectively—and the remaining $50,000 went towards Plaintiff's next installment payment, which became due on April 30, 2020. Thus, the first payment obligation for which prejudgment interest is available was the outstanding $12,500 portion of Plaintiff's April 30, 2020 installment. Prejudgment interest is also available on each of the subsequent $62,500 installments of her bonus from the dates on which they became due.[7]

## CONCLUSION

Plaintiff's motion for prejudgment interest, Dkt. No. 116, is GRANTED in part. Defendants' motion for a new trial or remittitur, Dkt. No. 121, is GRANTED in part. Plaintiff has the choice between a new trial on damages and a reduced verdict in the amount of $450,000. Plaintiff shall file a letter notifying the Court within twenty-one days from the date of this

---

[7] Those dates are: July 31, 2020; October 31, 2020; January 31, 2021; April 30, 2021; July 31, 2021; October 31, 2021; and January 31, 2022.

Opinion and Order whether Plaintiff accepts the reduced verdict or chooses a retrial on the issue of damages.

If Plaintiff files a letter accepting the reduced verdict, she shall file a proposed judgment within fourteen days thereafter that reflects the reduced damages award and includes prejudgment interest in accordance with this Opinion and Order.  Plaintiff shall also file a letter concurrently with her proposed judgment that sets forth her prejudgment interest calculations.

The Clerk of Court is respectfully directed to close Dkt. Nos. 116 and 121.

SO ORDERED.

Dated: December 26, 2023
     New York, New York

_____
              LEWIS J. LIMAN
          United States District Judge