UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
:
YOUNGJOO RHEE,                                       :
:
Plaintiff,          :
:
:                    21-cv-4283 (LJL)
-v-                            :
:                    OPINION AND ORDER
SHVMS, LLC, d/b/a SANTÉ VENTURES,                    :
:
Defendant.         :
:
----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _10/28/2024_

LEWIS J. LIMAN, United States District Judge:

On June 27, 2024, a jury delivered a verdict in favor of Plaintiff Youngjoo Rhee ("Rhee" or "Plaintiff") against Defendant SHVMS, LLC d/b/a Santé Ventures ("Santé" or "Defendant") in the amount of $1.4 million. Dkt. No. 180. At the close of evidence, Defendant brought a motion for judgment as a matter of law, and the Court reserved decision. Defendant now brings a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Dkt. No. 189. Plaintiff moves, pursuant to Federal Rule of Civil Procedure 59(d), to amend the judgment to add prejudgment interest. Dkt. No. 183.

For the following reasons, the motions are granted in part and denied in part.

## BACKGROUND

The Court discusses only the evidence adduced at trial relevant to the instant motions. On Defendant's Rule 50 motion, Court construes the evidence in the light most favorable to Plaintiff.

Santé is a venture capital firm that invests in early-stage companies. Trial Transcript ("Tr.") 57:20–21. In August 2010, Managing Director Kevin Lalande offered Rhee a job with Santé as Director of Marketing and Investor Relations, which she accepted. *Id.* at 58:1–7; Plf.

Ex. 1B ("Offer Letter").  Her base salary was $130,000 per year.  Tr. 70:1.  Rhee's job involved

sourcing, qualifying, and helping to close investments.  *Id.* at 58:16–18.

Rhee's offer letter stated that she would receive a cash bonus of:

1.00% of the total amount of capital directly raised, paid in equal quarterly installments over three years. 100% vested upon closing each LP; adjusted appropriately in the case of a defaulting LP. For example, if you are directly involved in sourcing, qualifying and helping us close $60MM in capital in Fund II, then your incentive compensation would be an additional $600,000 paid quarterly over three years, or $50,000 per quarter.

Offer Letter at 2.  An "LP" is a limited partner, which is industry terminology for an investor.

Tr. 72:19–20.  The Offer Letter also stated that Rhee would receive "0.50% of the carried

interest in Fund II per $20MM of capital directly raised, up to a maximum of 2.00%."  Offer

Letter at 2.

Rhee received a bonus of $200,000 in 2012, even though she did not close any

investments.  Tr. 70:13–71:3.  She received this bonus because Santé was happy with her work

connecting and making contacts with potential investors.  *Id.*; *id.* at 111:3–10.

 In her time with Santé, Rhee helped close two investors, one of which was the

Pennsylvania Public School Employees Retirement System ("PSERS").  Tr. 69:7–18.  PSERS is

a public pension fund.  *Id.* 71:10.  On December 19, 2018, PSERS issued a document titled

"Public Investment Memorandum, Santé Health Ventures III, L.P. & Santé Health Ventures IV,

L.P., Private Equity Fund Commitment."  Plf. Ex. 9.  In this document, PSERS staff

recommended to the PSERS Board a commitment of up to $75 million in Santé Health Ventures

III, L.P. and up to $75 million in Santé Health Ventures IV, L.P.  *Id.* at 1.  Lalande testified that

this document did not bind PSERS to invest in Fund III or Fund IV.  Tr. 127:24–128:25.

On May 28, 2019, PSERS entered into an agreement titled "Santé Health Ventures III

Parallel A, LP, Limited Partnership Agreement."  Plf. Ex. 17 ("Fund III Agreement").  The

agreement formed Santé Health Ventures III Parallel A, LLP, as a partnership with SHV

Management Services III as general partner and PSERS as limited partner.  *Id*.  Section 1.2 of the

agreement, titled "Purpose: Dual Fund Commitment," states:

> Subject to the provisions hereof, the Investor has agreed, in the aggregate, to
> contribute a total of $150 million to the Partnership and its immediate Successor
> Fund, namely, "Santé Health Ventures IV Parallel A, LP ("Fund IV"), comprised
> of a $75 million investment to the Partnership and a $75 million investment in Fund
> IV.  Fund IV is expected to be raised concurrently with Santé Health Ventures IV,
> LP, and the Investor will participate by making a capital commitment to Fund IV
> in the specified amount on the initial closing date for the family of funds then raised.

*Id.* § 1.2(b).  PSERS is defined as the Investor.  *Id.*  The Fund III Agreement additionally states

that PSERS will not be required to make a capital commitment to Fund IV if certain

contingencies occur, including changes in the managing members, changes in applicable terms

and conditions, or a negative due diligence determination.  *Id.*  It agrees that carried interest

earned by the general partner will be determined on a cross fund basis.  *Id* § 1.3(c).  The

remainder of the agreement, the body of which is 48 pages long, concerns the obligations of the

parties as partners of Santé Health Ventures III.  *See id.*

Brandt testified that the Fund III Agreement was the vehicle by which PSERS invested in

Fund III, and PSERS was not obligated to invest prior to executing this agreement.  Tr. 132:23–

124:8.  He testified that the Fund III Agreement did not obligate PSERS to invest in Fund IV.  *Id.*

at 133:17–134.  He stated that there were "certain stipulations here summarizing the things we

need to meet," and that at that time Fund IV did not exist and might not have come to exist.  *Id.*

133:23–134:5.

Rhee testified that PSERS closed its investment in Fund III in May 2019, when it signed

the Fund III Agreement.  *Id.* at 94:25–95:9.  She specifically testified that PSERS closed its

investment in Fund IV at a later date.  *Id.* at 94:10–16.  However, she stated that "[t]he

investment commitment for the amount was already determined for $75 million for the Fund IV

in 2019 May. But then the documents were signed later because the Fund IV started later." *Id.* at 95:18–21.  Rhee also testified that "closing an LP" means "receiving investment commitment from an investor," which is not the same as closing a fund.  *Id.* at 73:9–14.

Santé did not make any bonus payments to Rhee after the Fund III Agreement was signed.  *Id.* at 83:9.  In or around November 2019, Rhee asked Santé for her bonus.  *Id.* at 83:11–12.  On December 16, 2019, she sent a Slack message to Jason Brandt, CFO of Santé, stating that "the 1% from PSER's [sic] commitment should have been paid out quarterly" and asking why this had not yet started.  Plf. Ex. 6.  Brandt responded that they were reviewing her requests.  *Id.* On February 28, 2020, she sent a follow-up message to Brandt regarding "current & backed-up cash commissions which were due upon the closing of the fund III and the partial IV."  Plf. Ex. 7.  Rhee testified that by "partial IV" she meant the first three payment cycles of her commission for Fund IV.  Tr. 85:20–86:7.

On March 6, 2020, Santé sent Rhee a letter stating that "in recognition of your contribution, a cash bonus of $300,000.00 will be paid on March 13th."  Plf. Ex. 3.  It additionally stated that Rhee would receive a carried interest grant of 0.50% in Fund III.  *Id.* Lalande testified that the bonus was for bringing in PSERS.  Tr. 116: 15–16.  Rhee testified that at the time she thought this was a catch-up for late payments under the contract, and she expected to receive an additional $1.2 million.  *Id.* at 87:22–88:21.

Rhee's employment with Santé ended in July 2020.  *Id.* at. 89:10.  On July 13, 2020, after Rhee's termination, she emailed Lalande stating that the March 6 letter did not "specify the bonus catch-up for the remaining 2019 and I didn't get the 2nd Quarter payout for the 2020 yet," and asking if she should contact Brandt for a payment schedule.  Plf. Ex. 4; Tr. 88:24–90:14.  Lalande responded that "[t]he Mar 6 letter is the full bonus paid in recognition of your

contribution to Fund III fundraising," that the rates "for Fund II fundraising . . . would not have been anywhere close to market or made economic sense," and that "we sized the cash portion at about two times base pay in recognition of the value of PSERS and paid it to you in a lump sum rather than quarterly." Plf. Ex. 4.

On April 1, 2021, PSERS entered into an agreement titled "Santé Health Ventures IV Parallel A, LP, Limited Partnership Agreement" ("Fund IV Agreement"). Def. Ex. D. The Fund IV Agreement, which was substantially similar to the Fund III Agreement, formed Santé Health Ventures IV Parallel A, LLP, as a partnership with SHV Management Services IV, LP, as general partner and PSERS as limited partner. *Id.* The agreement noted that carried interest earned by the general partner would be determined on a cross fund basis with Fund III. *Id.* § 1.2(c). Brandt testified that PSERS was not obligated to invest in Fund IV until it executed this agreement. Tr. 135:17–19.

## PROCEDURAL HISTORY

Plaintiff filed the original complaint in this case on May 12, 2021. Dkt. No. 1. Plaintiff amended her complaint three times. Dkt. Nos. 13, 23, 42. The third amended complaint ("Complaint") was filed on December 10, 2021. Dkt. No. 42. It alleged causes of action for breach of contract, unjust enrichment, breach of fiduciary duty, fraud, attorney's fees and costs, and equitable estoppel. *Id.*

On December 23, 2021, Defendant moved to dismiss the Complaint for failure to state a claim. Dkt. No. 45. The Court granted Defendant's motion as to the claims for fraud, contractual attorney's fees, and equitable estoppel, but held that Plaintiff's claims for breach of contract, unjust enrichment, and breach of fiduciary duty were adequately pled. Dkt. No. 56. On November 18, 2022, after discovery, Defendant moved for summary judgment on the remaining claims. Dkt. No. 75. The Court granted summary judgment for Defendant on the claims of

unjust enrichment and breach of fiduciary duty, but it denied summary judgment on the breach of contract claim. Dkt. No. 91.

A jury trial was held on September 19–22, 2023. The jury found that Plaintiff proved by a preponderance of the evidence that Defendant's failure to pay her a cash bonus violated the terms of the 2010 Offer Letter. Dkt. No. 111. The jury found that Defendant's failure to award Rhee carried interest in Santé Ventures' Funds III and IV did not violate the terms of the offer letter. *Id.* The jury awarded Plaintiff compensatory damages of $1.5 million. *Id.* On October 2, 2023, the Court entered judgment for Plaintiff for $1.5 million. Dkt. No. 113.

On October 6, 2023, Plaintiff moved to amend the judgment to add prejudgment interest. Dkt. No. 116. On October 27, 2023, Defendant moved for new trial or a remittitur. Dkt. No. 121. After briefing and oral argument on both motions, Dkt. Nos. 116–125, the Court granted both motions in part, Dkt. No. 126.

The Court held that the jury made two specific, quantifiable errors which justified remittitur: (1) failing to deduct the $300,000 payment made to Plaintiff from her $750,000 bonus for Fund III and (2) awarding Plaintiff a $750,000 bonus for Fund IV. *Id.* at 10–18. The Court held that the Offer Letter unambiguously entitled Plaintiff to a cash bonus when an investor "closed" its investment in one of Santé's funds, which requires "a formal, binding commitment." *Id.* at 12. "Thus, Plaintiff earned her bonus under the Offer Letter when an investor formally consummated its investment in one of Defendant's funds." *Id.* The Court held that based on the evidence presented at trial, Plaintiff's bonus from Fund III vested when PSERS executed the Fund III Agreement in April 2019, entitling her to a $750,000 bonus. *Id.* at 13–14.

However, the Court held that "the overwhelming weight of evidence at trial" established that the $300,000 bonus payment in March 2020 was meant to compensate Plaintiff for bringing

in PSERS, with the result that she was "now entitled only to the $450,000 of her bonus that remains unpaid." *Id.* at 15–16. In addition, PSERS closed its investment in Fund IV only when the Fund IV Agreement was signed, which was after Plaintiff's employment had terminated. *Id.* at 18. Therefore, Plaintiff also was not entitled to a bonus for Fund IV. *Id.* The Court held that "Plaintiff has the choice between a new trial on damages and a reduced verdict in the amount of $450,000." *Id.* at 22.[1]

Rhee moved for reconsideration, Dkt. No. 128, and the Court denied the motion, Dkt. No. 134. The Court specifically rejected Rhee's contention that the Offer Letter's vesting clause is ambiguous, stating that "when read as a whole, the bonus provision dispels any doubt that closing refers to an investor's binding commitment to contribute capital." *Id.* at 4. The Court noted that the prior ruling "reflected its view of the evidence and argument presented to the Jury and Court at the time," and did not determine "how it would decide the issue of damages if new or different evidence were presented." *Id.* at 6.

Rhee rejected the reduced verdict and chose to move forward with a new trial. Dkt. No. 135. On March 15, 2024, the parties filed proposed jury instructions, motions in limine, requests to charge, and proposed pre-trial orders. Dkt. Nos. 138–150. Rhee also moved for partial summary judgment in the amount of $450,000. Dkt. No. 151. In a pretrial conference on April 26, 2024, the Court ruled from the bench on the motions in limine. Dkt. No. 168 at 6–8.[2]

---

[1] The Court additionally held that Rhee was entitled to prejudgment interest, but only from the dates that each unpaid installment of Rhee's bonus became due and unpaid. *Id.* at 21–22. Concluding that the $300,000 bonus payment covered the first four installments and $50,000 towards Plaintiff's next installment payment, the Court held that prejudgment interest was available on the outstanding $12,500 portion of Plaintiff's April 30, 2020, installment from that date, and on each subsequent $62,500 installment from the date it became due. *Id.*

[2] Specifically, the Court granted Defendant's motion in limine to exclude evidence of profits, revenues, and fees Defendant earned from PSERS's investments in Funds III and IV, denied Plaintiff's motion for partial summary judgment, and denied Plaintiff's motion in limine arguing

The parties then filed additional motions in limine, pretrial reports, and related motions and memoranda of law, which the Court ruled on in an order of June 10, 2024. Dkt. Nos. 163–174.

A jury trial took place on June 26–27, 2024, limited to the issue of damages, with evidence as stated above. At the close of evidence, Santé moved for a directed verdict that Plaintiff's damages are no more than $450,000, and the Court reserved decision. Tr. 144:16–17. The jury returned a verdict for Plaintiff in the amount of $1.4 million. Dkt. No. 180.

On July 10, 2024, Rhee filed a motion to alter the judgment by adding pre-judgment interest, which Santé opposed. Dkt. Nos. 183, 187. On July 25, 2024, Santé made a renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Dkt. Nos. 189–190. Plaintiff opposed, Dkt. No. 193, and Santé replied, Dkt. No. 194.[3]

_____

that the $300,000 payment should be inadmissible because a setoff defense was not properly pled. Dkt. No. 168 at 6–8.

[3] Plaintiff filed her opposition one day late, and Defendant argued in its reply that the opposition should be disregarded on this basis. Dkt. No. 194 at 1–3. Plaintiff then belatedly moved for leave to file a late opposition. Dkt. No. 196. An attached affirmation of counsel stated that he had been traveling overseas, miscalendared the response date, and did not realize the response was late until this was pointed out by Defendant's reply. Dkt. No. 197. Under Federal Rule of Civil Procedure 6(b), a Court may extend the time to file a motion due to "excusable neglect." Fed. R. Civ. P. 6(b). A court may consider "[1] The danger of prejudice to the [opposing party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was in the reasonable control of the movant, and [4] whether the movant acted in good faith." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395 (1993). The Second Circuit has especially emphasized the third factor, the reason for delay, and has suggested that "failure to follow the clear dictates of a court rule will generally not constitute such excusable neglect." *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003). However, the Circuit has also acknowledged that under *Pioneer*, courts are permitted "where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness," at least in limited instances. *In re Enron Corp.*, 419 F.3d 115, 122 (2d Cir. 2005) (quoting *Pioneer*, 507 U.S. at 388); *see Raymond v. Int'l Bus. Machs. Corp.*, 148 F.3d 63, 66–67 (2d Cir. 1998) (holding that the district court acted "well within its discretion" under *Pioneer* in excusing an inadvertently late jury demand when there was no bad faith or prejudice to any party). Here, although clerical error is a weak reason for delay, the response was only one day late and there is no evidence of prejudice or bad faith. In addition, the time limit here is not generally regarded as one on which substantial rights turn. *Cf. Silivanch*, 333 F.3d at 367 (deadline to file a notice of appeal); *Pioneer*, 507 U.S. at 395 (bankruptcy bar date). The time to

**LEGAL STANDARD**

Rule 50 allows a court to grant judgment as a matter of law if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50(a)(1). The standard for judgment as a matter of law "'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731 (2023) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250–251 (1986)). "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *S.E.C. v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)). "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Deloreto v. Karengekis*, 104 F. App'x 765, 767 (2d Cir. 2004) (summary order) (quoting *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir. 2001)); *see also ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) ("The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe." (citation omitted)). "A post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law has been made before submission of the case to the jury." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).

---

respond to a motion is set by the Local Civil Rules, which also provide that it can be freely altered "by the court in a judge's individual practices or in a direction in a particular case." Local Rule 6.1. Therefore, having considered the relevant factors, the Court grants Plaintiff's motion for a one-day extension in filing her response.

**DISCUSSION**

Defendant argues that its motion for judgment as a matter of law should be granted "[f]or many of the same reasons the Court granted Santé's motion for new trial following the first trial." Dkt. No. 190 at 2. The evidence introduced in the second trial is sufficient to support the jury finding that Rhee was entitled to a bonus for Fund IV. However, the Court agrees with Defendant that the $300,000 bonus paid to Plaintiff in March 2020 must be counted against Rhee's damages for Fund III. Therefore, the Court grants Defendant's motion only to the extent that Plaintiff's damages are reduced to $1.2 million.

I.    **Fund IV Bonus**

Defendant argues that "[t]he evidence in the trial record does not support any damages to Plaintiff for PSERS's investment in Fund IV." Dkt. No. 190 at 5. It contends that the only conclusion supported by the evidence at trial is that the Fund III agreement placed PSERS "under no binding legal obligation to make an investment in Fund IV," and that Fund IV did not close until the Fund IV Agreement was signed on April 1, 2021. *Id.* at 5–7.

However, a reasonable juror in this trial could properly conclude that Rhee was entitled to a bonus for PSERS's investment in Fund IV. This conclusion flows from two points: one related to the jury instructions and the other related to the evidence introduced.

First, it is critically important that Defendant acquiesced in and even supported the following instruction given by the Court regarding how the jury must determine damages based on Defendant's breach of contract:

> [Y]ou must decide whether, prior to the end of plaintiff's employment with defendant, PSERS made a binding legal commitment to invest in one or more of defendant's funds, and, if so, in what amounts. If so, then you must determine how much plaintiff was therefore entitled to under her contract's cash bonus provision and whether defendant paid any portion of the amount it owed plaintiff.

Tr. 195:1–4.  By virtue of this instruction, the question of whether a "closing" had occurred

under Rhee's contract was defined as whether PSERS "made a binding legal commitment to

invest."

There are other possible definitions of "closing."  Relevant here, closing may be used to

refer to when the parties take the "final steps" in a transaction, or when "conveyancing

documents are concluded and the money and property transferred."  *Closing*, Black's Law

Dictionary (12th ed. 2024). [4]  Under that definition, even if there was a legally binding

agreement to invest during Rhee's employment, if the final steps to consummate that investment

occurred after Rhee's employment, she would not receive a bonus. But that is not a definition

Defendant sought here.

Defendant initially sought no instruction on the meaning of "closing."  Dkt. No. 142.  On

the first day of trial, Plaintiff sought an instruction that the term "closing" in the Offer Letter is

ambiguous.  Tr. 12:6–11.  The Court asked Plaintiff how such an argument was sustainable given

its rulings after the first trial with respect to the meaning of "close."  *Id.* at 12:15–18.[5]  Counsel

stated that Plaintiff would put on evidence that there was a commitment to invest in Fund IV

---

[4] This interpretation of "closing" might have special force in a situation where the bonus or commission is to be paid out of the money to be transferred, such that the payor cannot pay the bonus until he himself is paid from the transaction.  It is not clear that such a situation is presented here, and in any case any inference to this effect would be overridden by the jury instructions on the meaning of "closing" which were agreed to by the parties.

[5] As stated above, the Court ruled after the first trial that closing unambiguously requires a "formal, binding commitment," and "Plaintiff earned her bonus under the Offer Letter when an investor formally consummated its investment in one of Defendant's funds."  Dkt. No. 126 at 12–14.  Because the Fund III Agreement was not introduced in the first trial, the issue addressed in that opinion was whether the non-binding memorandum recommending investment to PSERS's board could be within the contractual definition of "closing."  *Id.*  The Court was not required to draw a clear distinction between definitions of "closing" focusing on binding commitment and definitions focusing on the final steps of a transaction or the transfer of title, because the non-binding memorandum did not constitute a closing under either definition.

during Rhee's time at Santé, but that Defendant was arguing that "just because there was a commitment, that's not the same as what the closing means in the language of the contract." *Id.* at 13:2–5. The Court then asked defense counsel whether the point was that "as of the time of Ms. Rhee's departure . . . there was no binding legal agreement," and defense counsel agreed that this was correct. *Id.* at 13:6–10. Plaintiff's counsel stated: "You're saying the law of the case is—if we prove that, that there was a binding legal commitment prior to her leaving for both funds, I'm okay with that. But that's not how they're interpreting it." *Id.* at 14:3–6. The Court therefore asked defense counsel "whether there's any disagreement that the contracts required a binding legal commitment to contribute to Fund IV prior to the time of Ms. Rhee's departure." *Id.* at 14:7–10. Defense counsel responded: "No. I think we agree that the offer letter, the employment agreement requires that binding legal agreement." *Id.* at 14:11–14. The Court stated that it would give a jury instruction as to the meaning of "close" based on that language, and not based on Plaintiff's proposed language. *Id.* at 15:4–7.

At the end of the day, the Court revisited the issue of the instruction regarding interpretation of the contract. Plaintiff again asked for an instruction on ambiguity. *Id.* at 147. The Court proposed an instruction that:

> For a given fund, plaintiff is entitled to a bonus if PSERS made a binding legal commitment to invest before plaintiff's departure from defendant. Conversely, if PSERS did not make a binding legal commitment to invest in a given fund prior to plaintiff's departure, then plaintiff is not entitled to a bonus based on PSERS' investment in that fund.

*Id.* at 149:3–8. After some discussion with Plaintiff's counsel, the Court rephrased the issue as "whether, prior to Ms. Rhee's departure from defendant, PSERS had made a binding legal commitment to invest in one or more funds of the defendant and in what amounts." *Id.* at 151:15–17. Defense counsel was specifically asked for his view on this language and stated "I think that's okay." *Id.* at 151:18. The Court then stated it would charge based on that language.

There is no question that defense counsel had extensive opportunity to object to the proposed instruction. Plaintiff specifically ascribed to Defendant the position that a commitment was not enough to meet the contractual definition of "closing," and in response Defendant did not take that position, but rather stated that the issue was whether there was a legally binding commitment. *Id.* at 13–15. Defendant has never objected to the jury instruction, and still does not object. *See* Dkt. No. 194 at 5 ("Defendant's Motion is not based on, nor is it an after-the-fact objection to, the Court's Jury Instructions."). Therefore, Defendant's motion must rise or fall on whether PSERS made a binding legal commitment to invest in Fund IV during Rhee's employment, not whether some other definition of "closing" was met. *See ING Glob.*, 757 F.3d at 96–99 (reversing the district court's decision to grant a new trial based on an alternative legal theory when "the court had delivered the charge on this issue that [defendant] had requested" and "[defendant] failed to object to the charge under Rule 51"); *see also Jacques v. DiMarzio, Inc.*, 386 F.3d 192. 200 (2d Cir. 2004) ("[T]he purpose of Fed. R. Civ. P. 51 is 'to allow the trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate.'" (quoting *Fogarty v. Near N. Ins. Brokerage, Inc.,* 162 F.3d 74, 79 (2d Cir. 1998))).

Plaintiff introduced sufficient evidence at this trial for a reasonable juror to find that PSERS made a binding legal commitment to invest in Fund IV during Rhee's employment. The key piece of evidence supporting this conclusion is the Fund III Agreement, which was not introduced at the first trial. The agreement states, inter alia, that:

> Subject to the provisions hereof, the Investor has agreed, in the aggregate, to contribute a total of $150 million to the Partnership and its immediate Successor Fund, namely, Santé Health Ventures IV Parallel A, LP ("Fund IV"), comprised of a $75 million investment to the Partnership and a $75 million investment in Fund IV. Fund IV is expected to be raised concurrently with Santé Health Ventures IV, LP, and the Investor will participate by making a capital commitment to Fund IV in the specified amount on the initial closing date for the family of funds then raised.

Plf. Ex. 17 § 1.2(b).  There is no dispute that the Fund III Agreement is a binding contract.  *See id.* § 15.8 (providing that "[t]his agreement shall be binding"); *Tchrs. Ins. & Annuity Ass'n of Am. v. Trib. Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) ("The intention to create mutually binding contractual obligations is stated with unmistakable clarity.").  Section 1.2(b), a provision within this contract, uses explicit language of agreement to invest in Fund IV, stating that "the Investor has agreed . . . [to] a $75 million investment in Fund IV," and "will participate" by making a capital commitment of that amount on the closing date.  Plf. Ex. 17 § 1.2(b).  On its face, this provision legally binds PSERS to make a capital commitment of $75 million on the closing date for Fund IV.

Although Defendant points to evidence that Fund IV "closed" in April 2021 when the Fund IV agreement was signed, this evidence is beside the point.  Dkt. No. 190 (citing Tr. 94:25–95:6, 132:19–133:8, 134:16–135:19; Fund IV Agreement).  The argument relies on a definition of "close" that is not supported by the jury instruction on which the parties agreed.  There is no dispute that the transaction "closed" in April 2021 in the sense of taking its final steps.  But the instruction stated that a bonus was earned when the investment "closed" in the sense that PSERS was legally bound to invest.  There is no inconsistency in a jury finding that the Fund III Agreement bound PSERS to invest in or "close" on Fund IV at a later time, and then at that later time PSERS actually did so.  A reasonable juror could conclude that the Fund III Agreement placed PSERS under an obligation to invest, such that if PSERS had not invested in Fund IV when that Fund was formed, it would have been in breach of contract.  This is sufficient to support the verdict, even if the final steps of the investment happened when the Fund IV Agreement was signed in 2021.

Defendant also argues that the "multiple express contingencies" included in Section 1.2(b) mean that PSERS "was under no binding legal obligation to make an investment in Fund IV at the time it signed the Fund III Agreement." Dkt. No. 190 at 7. The contingencies are that (i) no fewer than three of the current Managing Members or certain other persons described in the agreement shall serve in a similar capacity at the inception of Fund IV; (ii) the terms and conditions of Fund IV shall be substantially similar to Fund III; (iii) that operational due diligence does not show that any of the Managing Members have been convicted of a felony; and (iv) operational due diligence does not lead to a Negative Determination, defined as a determination that investment "would present significant operational risk to the Investor or significant potential negative legal consequences." Plf. Ex. 17 § 1.2(b). Initially, the level of detail at which these contingencies are expressed, which is significant,[6] strongly reinforces the conclusion that the provision generally binds PSERS to contribute to Fund IV. If the agreement

---

[6] Inter alia, the provision specifies that: "With respect to clauses (iii) and (iv) above, the parties agree: (A) to cooperate to effectuate the operational due diligence process in a timely manner so that the Investor may participate in Fund IV on the above specified timing; (B) that the ODD Consultant hired in connection with clauses (iii) and (iv) above will be one of the following firms: Hamilton Lane, Aksia or AON, or any of their respective successors in interest (including successors in interest from a reorganization); (C) if the initial ODD Consultant provides a Negative Determination, (1) the General Partner and its Affiliates shall have ninety (90) days following receipt of notice to the General Partner of such Negative Determination to cure any deficiencies noted in such Negative Determination (if subject to cure) and (2) if the deficiencies noted in such Negative Determination are not cured (or are not subject to cure) as described in clause (1), the Investor shall hire one of the other ODD Consultants described in clause (B) above to provide a second and independent operational due diligence review of Fund IV and, if such ODD Consultant does not provide a Negative Determination, then the Investor shall hire a third ODD Consultant mutually acceptable to the other two ODD Consultants to provide a third independent operational due diligence review of Fund IV and, if such third ODD Consultant also provides a Negative Determination that is not (or is not subject to) a cure within ninety (90) days of notice to the General Partner of such Negative Determination, then the Investor shall not be required to make a capital commitment to Fund IV." Fund III Agreement § 1.2(b).

to invest in Fund IV were nonbinding or merely hortatory, there would be no reason to state in such exhaustive detail what conditions need to be met to allow PSERS to back out.

Moreover, neither the mere existence of contingencies nor the content of these contingencies here prevents the provision as a matter of law from creating a "binding legal commitment to invest" in Fund IV. A binding contract which excuses performance upon the occurrence of certain conditions is still a binding contract, not a mere suggestion or legal nullity. *Westerbeke Corp. v. Daihatsu Motor Co*., 304 F.3d 200, 210–16 (2d Cir. 2002) (distinguishing between a nonbinding preliminary agreement and a binding contract with conditions precedent); *Deutsche Bank Sec. Inc. v. Kingate Glob. Fund Ltd*., 2021 WL 1163715, at *10 (S.D.N.Y. Mar. 26, 2021) (after finding that a contract was binding, analyzing whether the failure of a condition precedent excused performance). And a reasonable characterization of what the provision bound PSERS to do is that it bound PSERS to invest. *Cf. Edge Grp. WAICCS LLC v. Sapir Grp. LLC*, 705 F. Supp. 2d 304, 312 (S.D.N.Y. 2010) (describing exercise of option as "creat[ing] a binding contract of sale" even though "pre-closing obligations" still needed to be fulfilled). The provision did not bind PSERS merely to negotiate further terms or engage in discussions about Fund IV in good faith. *Cf. Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc*., 145 F.3d 543, 548 (2d Cir. 1998) (discussing "binding preliminary commitments" in which the parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement," but do not commit to an "ultimate contractual objective" (quoting *Tribune*, 670 F. Supp. at 498)). It obligated PSERS to invest a specific sum at a specific time, provided that certain conditions were satisfied. If the initial closing date arrived and PSERS did not invest $75 million in Fund IV, Santé would have a cause of action for breach of contract based on the binding legal obligations set out in the Fund III agreement.

Defendant's argument implies that no "commitment to invest" can exist until all conditions precedent to the investment are satisfied, such that the duty to invest becomes absolute and unconditional.  But the jury instruction premised Plaintiff's bonus on when "PSERS made a binding legal commitment to invest," not on when the duty to invest became unconditional.  Tr. 149:3–8.  A party binds itself in contract when it executes the contract, not when the contingencies in the contract are fulfilled.  If a purchaser contracts to buy a house on condition that the inspection reveals no difficulties, and a month later the inspection reveals no difficulties, the purchaser does not at that point make a binding legal commitment to buy the house.  The purchaser does not at that point do anything.  Rather, the binding legal commitment that the purchaser made a month earlier places a duty on her to buy the house.  *See, e.g.*, *Edge Grp. WAICCS*, 705 F. Supp. 2d at 312.  Similarly here, the commitment is made at the time the Fund III Agreement is signed, not when conditions precedent are satisfied.  The incoherence of Defendant's position is demonstrated by the fact that although no party disputes that the Fund III Agreement committed PSERS to invest in Fund III, the Agreement contained conditions under which PSERS would not be obligated to contribute capital to Fund III.  *See* Fund III Agreement §§ 4.6, 8.3, 14.6.  Plaintiff did not need to wait and ensure that none of these conditions would occur before she was entitled to her Fund III bonus.  She was entitled to the bonus when the agreement was signed, because that is when the commitment was made.  Similarly, Plaintiff did not need to wait to be sure that no conditions relieving PSERS from investment in Fund IV occurred before she was entitled to her Fund IV bonus.

The content of the contingencies reinforces the conclusion that the Fund III Agreement can reasonably be understood as a binding legal commitment to invest in Fund IV.  The contingencies do not give PSERS broad discretion to back out of Fund IV.  Rather, the provision

states, essentially, that PSERS is obligated to invest in Fund IV so long as the status quo remains in place. Fund III Agreement § 1.2(b). PSERS can only back out if the Managing Members leave the Fund and are not satisfactorily replaced, the fund terms and conditions substantially change, or in certain extreme circumstances such as the conviction of a Managing Member. *Id.* The conditions are consistent with the idea that Fund IV was planned as a continuation of Fund III, an idea which is further reinforced by the provision that carried interest will be determined on a cross fund basis. *Id.* § 1.3. A provision that the parties need not perform if there are serious intervening changes in circumstances can be reasonably expected in any contract that contemplates performance years in the future. It does not mean that such a commitment to perform is nonbinding.

The jury here reasonably found that "PSERS made a binding legal commitment to invest [in Fund IV] before plaintiff's departure from defendant." Tr. 195:1–4. The language of the Fund III agreement supports a binding legal commitment to invest in Fund IV. A jury could reasonably find that such binding legal commitment was "made" at the time the contract is signed, not at the time conditions precedent are fulfilled or the final steps in the transaction were taken. Defendant cannot now be heard to argue that PSERS's investment "closed" only when the final steps in the transaction were taken, having previously agreed to a jury instruction based on the time that a binding legal commitment to invest was made.

## II.    Fund III Bonus

Defendant also argues that "[t]here is no legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff is entitled to a bonus on PSERS's investment in Fund III of more than $450,000." Dkt. No. 190 at 8. The Court agrees. The only reasonable conclusion from the evidence introduced at trial is that Plaintiff's $300,000 bonus in March 2020 was compensation for securing PSERS's investment in Fund III.

The evidence on this point is very similar to the evidence in the first trial.  On December 16, 2019, Rhee asked for her bonus of "the 1% from PSER's commitment."  Plf. Ex. 6.  She followed up on February 28, 2020, requesting commissions from "the closing of the fund III and the partial IV."  Plf. Ex. 7.  Only about a week later, Santé sent her a letter stating she would be paid $300,000 in recognition of her "contribution."  Plf Ex. 3.  The letter additionally granted Rhee carried interest of 0.50% specifically in Fund III.  *Id.*  Lalande testified that the "contribution" referred to in the letter was bringing in PSERS as an investor, Tr. 116:15–16, and stated the same thing to Rhee in his email of July 2020, Plf. Ex. 4.  Rhee testified that at the time, she also thought the bonus was for bringing in PSERS as an investor.  Tr. 87:22–88:21.  Then, in response to Rhee's inquiry about further payments in July 2020, Lalande stated that "[t]he Mar 6 letter is the full bonus paid in recognition of your contribution to Fund III fundraising," and that "we sized the cash portion at about two times base pay in recognition of the value of PSERS and paid it to you in a lump sum rather than quarterly."  Plf. Ex. 4.  Plaintiff acknowledged in closing that she had the burden of proof on damages, and no party objected to a jury instruction to the same effect.  Tr. 172:18.

Damages in a contract action are intended "to place the non-breaching party in as good a position as it would have been had the contract been performed."  *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 692 N.E.2d 551, 553 (N.Y. 1998).  Damages should not provide the injured party with a windfall or place her in a better position than if the contract had been performed.  *See E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 304 (N.Y. 2018); *Carco Group, Inc. v. Maconachy*, 718 F.3d 72, 83 (2d Cir. 2013).  If the contract had been performed here, it is undisputed at this point in the litigation that Rhee would have received $750,000 for bringing in PSERS's investment in Fund III.  If she already received $300,000 for

bringing in PSERS's investment in Fund III, to be made whole as to Fund III she must receive an additional $450,000. Granting her an additional $750,000 would give her a total bonus of $1,050,000 for Fund III, placing her in a better position than if the contract had been performed.

Plaintiff argues that issues of fact exist regarding whether the $300,000 was a partial payment of Rhee's bonus for Fund III. Dkt. No. 193 at 7. If the $300,000 was paid to Rhee for some other reason, she would be entitled to collect both the $300,000 and her full bonus for bringing in Fund III. But there is no evidence to support such a conclusion. There is no evidence of any other "contribution" for which Rhee could reasonably have received a bonus in March of 2020. Although Rhee once received a discretionary bonus for her general good work, Tr. 70:13–71:3, a reasonable juror could not conclude that this was such a bonus. Immediately after Rhee asked for a bonus based on her contribution in closing PSERS, she received a bonus which she assumed was for her contribution in closing PSERS and which the Managing Director stated was for that contribution. There is no basis for the jury to have concluded it was for any other purpose.

Even if a jury entirely discredited all of Lalande and Brandt's testimony, as Plaintiff suggests it could, there would not be sufficient evidence to support a verdict for Plaintiff on this issue. Plaintiff herself testified that she asked for a bonus based on Fund III, Brandt did not dispute that she was owed a bonus, and then about a week later she received a bonus which she believed was for Fund III. Tr. 86–88:5. Rhee did not suggest that she later realized the bonus was for another purpose, she merely testified that she later realized Lalande was not going to pay her according to the contract. *Id.* at 89–90; *see* Plf. Ex. 4. Plaintiff similarly argued in closing that "[i]f you think it wasn't part of the contract and shouldn't be credited, then you should enter a verdict for $1.5 million." Tr. 178:13–14. But while a jury could rationally find that Defendant

did not intend the $300,000 as catch-up for payments due under the Offer Letter, *see* Plf. Ex. 4,

the decisive issue is not whether Defendant intended to honor the contract but whether the

payment was a bonus for bringing in Fund III.  Defendant's repudiation of the contract does not

entitle Plaintiff to double recovery for her services.  If a creditor holds a debt of $20,000 to be

paid in $1,000 installments, and when the creditor asks for payment the creditor hands him

$3,000 and repudiates the contract, the damages are not $20,000.  They are $17,000.  Similarly

here, so long as the $300,000 payment was for Plaintiff's Fund III bonus and not some other

purpose, it need not have been made with intent to honor the contract.

Because a reasonable jury could only conclude that Plaintiff has already received a

$300,000 bonus for closing Fund III, she is entitled to $450,000, and not more, to place her in the

position she would have been in had the contract been performed with respect to Fund III.

**III.    Calculation of Damages and Prejudgment Interest**

As a matter of law, Plaintiff is entitled to a maximum of $450,000 in damages for

nonpayment of the Fund III bonus.  Plaintiff is entitled to a maximum of $750,000 in damages

for nonpayment of the Fund IV bonus, meaning that in total the maximum damages Plaintiff can

recover as a matter of law is $1.2 million.  The jury awarded a verdict for Plaintiff of $1.4

million.  Dkt. No. 180.

It is not clear whether the jury award consisted of $750,000 for Fund IV and $650,000 for

Fund III, the former amount for Fund III and the latter amount for Fund IV, or any other

combination of amounts that add up to $1.4 million.  The verdict form is not broken down by

category and simply lists a single amount.  Dkt. No. 180.  Therefore, although it is clear that the

$300,000 payment for Fund III must be excluded from the verdict, it is not clear to what extent it

is already excluded from the verdict and to what extent it is included.  *See Trademark Rsch.*

*Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993) ("Although we have identified

error in quantifiable amounts, no one can determine whether the jury included any or all of this amount in the verdict.").

In this situation, the Second Circuit has "applied the least intrusive standard for calculating remittitur, reducing the verdict 'only to the maximum that would be upheld by the trial court as not excessive.'" *Id.* (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)). This furthers the "'two principal objectives' of remittitur: (i) 'to enable the parties to avoid the delay and expense of a new trial when a jury award is intrinsically excessive' and (ii) 'to minimize the extent of judicial interference with a matter that is otherwise within the jury's domain.'" *Id.* (quoting *Earl*, 917 F.2d at 1328). Under this standard, the Court remits the damages award to $1.2 million.[7]

As stated in the Court's order following the first trial, Plaintiff is entitled to prejudgment interest from the date on which each installment of her bonus became due. Dkt. No. 126 at 19–21; *see* N.Y. C.P.L.R. § 5001(b). The Court additionally concluded as to the Fund III bonus that "$250,000 of the March 13, 2020, payment provided Plaintiff the first four installment payments of $62,500 . . . and the remaining $50,000 went towards Plaintiff's next installment payment." Dkt. No. 126 at 22. The Court adopts the same conclusions here as to the $450,000 of the damages award representing the Fund III bonus. The Fund III Agreement was dated May 28, 2019, making the first quarterly installment payment due on July 31, 2019.[8] That payment and

---

[7] The Court additionally notes that, although the Second Circuit has suggested that a claimant who opposes a special verdict form should bear "the risk of uncertainty as to whether the jury included in its award items of damages that are later disallowed," here Plaintiff actually sought a special verdict form that would have avoided any uncertainty, which was rejected. Dkt. No. 146; *see* Dkt. No. 168 at 15.

[8] As in the previous order, the Court in its discretion treats a payment on the last day of the relevant month as a timely quarterly payment under the Offer Letter's cash bonus provision. Dkt. No. 126 at 21 n.6.

the next three quarterly payments due on October 31, 2019, January 31, 2020, and April 30, 2020, are fully covered by the $300,000 paid to Plaintiff in June 2020.  The first obligation for which prejudgment interest is available is the outstanding $12,500 portion of Plaintiff's July 2020 installment, and prejudgment interest is then available on each subsequent $62,500 installment from the date it is due.

As detailed above, the evidence introduced at the second trial supports the conclusion that Plaintiff's Fund IV bonus, like her Fund III bonus, vested upon the signing of the Fund III Agreement.  Therefore, it would have become due in quarterly payments on the same amounts and dates as the Fund III bonus.  There is no evidence that any amount of the $300,000 payment Plaintiff received in March 2020 was intended as part of her Fund IV bonus.  Therefore, Plaintiff is entitled to prejudgment interest from the date that each $62,500 installment of her Fund IV bonus became due, beginning on July 31, 2019.

## CONCLUSION

Defendant's renewed motion for judgment as a matter of law is GRANTED IN PART and DENIED IN PART.  Plaintiff's motion for prejudgment interest is GRANTED IN PART and DENIED IN PART.  Plaintiff has the choice between a new trial on damages and a reduced verdict in the amount of $1,200,000.  Plaintiff shall file a letter notifying the Court within twenty-one days from the date of this Opinion and Order whether Plaintiff accepts the reduced verdict or chooses a retrial on the issue of damages.

If Plaintiff accepts the reduced verdict, she shall file a proposed judgment within fourteen days thereafter that reflects the reduced damages award and includes prejudgment interest in accordance with this Opinion and Order. Plaintiff shall also file a letter concurrently with her proposed judgment that sets forth her prejudgment interest calculations.

The Clerk of Court is respectfully directed to close Dkt. Nos. 183 and 189.

SO ORDERED.

Dated: October 28, 2024
     New York, New York

                                    LEWIS J. LIMAN
                            United States District Judge